[Crim. No. 10681. In Bank. Apr. 15, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GUS TOLBERT, Defendant and Appellant.

792

Roger S. Hanson, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—A jury found defendant guilty of kidnaping Fannie Ryan (Pen. Code, § 207) and first degree murder of Akie Sterling (Pen. Code, §§ 187, 189). It fixed the penalty for murder at death. Motions for a new trial and for reduction of the penalty were denied. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

*Facts:* On April 21, 1966, about 1:30 in the morning Fannie Ryan was returning home from work and got off a bus at the corner of Van Ness and Florence in Los Angeles. She noticed defendant, who was in a dark green pickup truck with gardening equipment on it, at the intersection watching her. She had never seen him before, and continued walking down Van Ness toward her house. Defendant drove down the street past her, turned at the corner of the second block, and parked around the corner. As she neared the corner, defendant approached her with a shotgun or rifle in his hands and told her to walk around the corner with him. He told her not to scream or he would kill her. She was frightened and walked around the corner with him. About half way down the block, having decided that he probably would kill her anyway and that she might as well try to get away then, she jerked away from him. He cocked the rifle at her, and she threw her hands

over her face and started screaming. He struck her with the rifle, crushing her left elbow, and ran off. In about two weeks, the police took her to defendant's house, where she identified him and his truck.

Akie Sterling was an Oriental girl whom Curtis Sterling had married while in the service and brought to the United States. For about four months before her murder, defendant, a gardener by occupation, had lived next door to the Sterlings with his cousin, Mrs. Ferguson.

On April 27, 1966, when Mr. Sterling left for work about 6 a.m., Akie Sterling was at home and in good health. She had planned to go to the unemployment office and afterward to paint the guest room. Mr. Sterling returned home about 6 p.m. and found the back door locked. He entered the house by unlocking a side door. There was mail on the dining room table where his wife customarily placed it and an unemployment card which she had undoubtedly received at the unemployment office. Sterling went to the guest room and found his wife, clad in a slip, lying on the floor dead. He noticed that paint had been scraped from the walls and saw unopened paint cans standing nearby. The bed was pushed to one side, and a lamp had been knocked off a table onto the floor. There was a hole in the floor that had not been there when he went to work.

When Mrs. Ferguson left for work in the morning, defendant was still in bed, and when she returned home between 2 and 2:30 in the afternoon he was gone. He came home about 7 p.m.

The postman testified that he delivered the Sterlings' mail between 1:15 and 1:20 in the afternoon on April 27, 1966. Within a minute thereafter, he delivered mail to the Ferguson house and saw defendant on the porch.

As the result of an autopsy performed on Mrs. Sterling by Dr. Harold Kade, Senior Deputy Medical Examiner for the Los Angeles County Coroner's office, he concluded that she died of gunshot wounds in the head and chest. He recovered a bullet, which was fragmented into two portions of lead and copper jacket, from her head. The bullet had entered the back of the head, slightly to the right of the midline. Dr. Kade removed the copper jacket from underneath the scalp in the right rear area of the head, outside the skull bone. The remainder of the bullet traveled forward and toward the left and was recovered from the middle of the head. Another bullet entered the center of the chest, slightly to the left of the midline, traveled completely through the body and emerged

just inside the left shoulder blade. From the skin around the exit wound from this bullet, there appeared a ring of abrasion or scraping, indicating that the skin was in contact with a hard surface at the time the bullet made its exit and that the body was lying on the floor when the shot was fired. Around the entrance of the wound, on the skin of the chest, Dr. Kade observed powder tattooing, and particles of gun powder were imbedded in the skin. The bullet that went through the chest pierced the floor and was later dug out from under the house by a criminalist from the Los Angeles Police Department.

In the opinion of Dr. Kade, both shots caused mortal wounds. The head wound penetrated vital centers in the brain that control the heartbeat and respiration and, when destroyed, result in death. The chest wound perforated the heart and left lung, resulting in massive hemorrhaging, and unquestionably was an inevitably fatal wound.

An examination of the smears of seminal fluid removed from the vagina and rectum disclosed large numbers of male sperm. Dr. Kade testified that there was no possible way for spermatozoa to enter the rectum other than through the anus. Had it been ingested, it would have been destroyed by digestive processes prior to reaching the rectum. He further testified that any male discharge would not remain in the vagina of a living woman longer than 48 to 72 hours at the most, and that spermatozoa from intercourse between Mr. and Mrs. Sterling the preceding Saturday, followed by a douche, could not still be present on Wednesday, the day Mrs. Sterling died.

Mr. Sterling testified that he and his wife had last had intercourse on the previous Saturday; that never during their marriage had they engaged in rectal intercourse; and that after sexual relations Akie customarily used a douche.

In addition to the bullet wounds, Dr. Kade found other injuries to the body,—a slight abrasion on the upper chest to the right of the breastbone; a bruise on the forehead above the eyebrows; abrasions on the neck that could have been caused by manual strangulation; and scraped areas around the ear, jaw, side of the neck and chin. An examination of the vaginal and rectal areas failed to disclose any visible lacerations, tears, hemorrhaging or bruising.

About 2:45 p.m. on May 3, 1966, Sergeant Hambly of the Los Angeles Police Department, drove Fannie Ryan to defendant's home, less than a mile from her home. Defendant was seated in his truck parked on the street. Miss Ryan identified the truck and identified defendant as the man who had

accosted her with a shotgun on April 21, 1966. About 20 minutes after Miss Ryan's identification, the officer arrested defendant beside his truck.

Sergeant Hambly and Officer Smith of the Latent Finger-print Section of the Los Angeles Police Department's Scientific Investigation Division returned to defendant's home about 6 p.m. with a search warrant. Mrs. Ferguson gave them permission to enter and search her house. In the space between the floor and the bottom drawer of a cabinet in the bathroom, Sergeant Hambly saw a brown paper bag and in it a leather object resembling a holster and the butt of a pistol. Officer Smith removed the pistol and holster, checked them for fingerprints, preserved the paper bag for chemical treatment for the development of fingerprints, and took the gun, holster and paper bag from the premises. Upon making their discovery, the officers called Mrs. Ferguson to the bathroom and showed her the gun and holster. She said the gun was not hers; she did not know it was there; and she had not given anyone permission to put it there.

Later when defendant telephoned Mrs. Ferguson, she told him of the officers' finding the gun in the drawer and asked him if he had put it there. He replied, "Forget about it." She asked him, "Was that your gun?" and he answered, "Just forget about it."

On May 4, 1966, Officer Cooper of the Los Angeles Police Department placed defendant's fingerprints on a fingerprint card. Through the use of the chemical treatment for the development of fingerprints he found prints on the paper bag that had contained the gun and holster. He photographed the print, made an enlargement of the photograph, and compared it with an enlargement of a portion of defendant's palm print. On the basis of this comparison he formed the opinion that the print on the paper bag was made by the same person who made the palm print on defendant's fingerprint card.

Dewayne Wolfer, a chemist and ballistics expert with the Scientific Investigation Division Crime Laboratory of the Los Angeles Police Department, testified that the gun, a nineteenth century Colt, when fired at a target would cause sooting on the target only within a distance of 9 inches from muzzle to target. He test-fired the gun in his laboratory and recovered the slug. He went to the Sterling house and examined the bullet hole in the floor of the guest room. He shoved a rod down the bullet hole and crawled under the house, where he dug out a bullet. He examined these two bullets, as well as

the bullet that Dr. Kade had removed from Mrs. Sterling's head, and on the basis of that comparison he formed the conclusion that all three bullets were fired from the same gun.

Apart from the examination conducted by Dr. Kade, Officer Wolfer made a chemical analysis of the specimens of semen and pubic hairs removed from the deceased by Dr. Kade. He found that the three slides were contaminated with sperm and that it was highly probable that the white incrustation on the hairs was male ejaculation.

- Defendant's contentions:

First, *that there is insufficient evidence to support the judgment of conviction of murder in the first degree in the commission of burglary and rape.*

This contention is without merit. Defendant claims that the prosecution failed to prove either burglary or rape and therefore it was error for the district attorney to have so promised in his opening statement; also that it was error to produce evidence of sodomy because the only effect of this testimony was to prejudice defendant in the eyes of the jury.

The People may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he was the perpetrator thereof. (*People* v. *Hillery,* 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Huizenga,* 34 Cal.2d 669, 675 [1], 676 [3] [213 P.2d 710].) The district attorney was entitled to introduce evidence of burglary and rape in support of his theory under the felony-murder doctrine and to introduce evidence of sodomy in support of the theory of burglary and of a forced sexual assault as distinguished from a consensual sexual act.

In arguing insufficiency of the evidence, defendant emphasizes the inferences favorable to the defense, stressing the fact that the autopsy surgeon found no contusion about the victim's vagina or rectum.

The rule on review of the sufficiency of the evidence is that the weight of the evidence is for the jury to determine in the first instance, and the trial court after the verdict in the second instance. If, as in the present case, the circumstances reasonably justify the verdict, an opinion of this court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (*People* v. *Hillery, supra,* 62 Cal.2d 692, 702-703 [2-5]; *People* v. *Teale,* 63 Cal.2d 178, 187 [6] [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v.

*Griffin,* 60 Cal.2d 182, 188 [2-3] [32 Cal.Rptr. 24, 383 P.2d 432], revd. on other grounds, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *People* v. *Robillard,* 55 Cal.2d 88, 93 [2] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)

Applying the foregoing rule to the evidence introduced in the instant case, circumstantial as it may be, the record supports the finding of guilt of first degree murder. "Murder is the unlawful killing of a human being with malice aforethought." (Pen. Code, § 187.) To constitute murder in the first degree the homicide must have been perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or committed in the perpetration of certain enumerated serious felonies, including burglary and rape. (Pen. Code, § 189.)

To establish guilt of first degree murder under the felony-murder doctrine, the prosecution must prove that the defendant harbored the specific intent to commit one of the enumerated felonies. (*People* v. *Anderson,* 63 Cal.2d 351, 358 [2] [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Sears,* 62 Cal.2d 737, 744 [9] [44 Cal.Rptr. 330, 401 P.2d 938].)

The intent to commit the felony may be inferred from the attendant facts and circumstances. (*People* v. *Moore,* 48 Cal.2d 541, 547 [5-6] [310 P.2d 969]; *People* v. *Subia,* 239 Cal.App.2d 245, 251 [4] [48 Cal.Rptr. 584].)

The evidence in the present case demonstrates almost to a certainty that defendant entered the Sterling home, taking with him a Colt pistol; that he knew Akie Sterling was home because he lived next door and had undoubtedly seen her get her mail that day; that he entered the guest room where he found her preparing to paint the room; that he entered with intent to commit rape and sodomy upon her; that he struggled with her and shot her in the back of the head; that after she fell to the floor mortally wounded he fired a second shot through her chest; and that he then raped her and committed sodomy upon her. The fact that force was used and that the victim resisted is indicated by the multiple bruises and abrasions on her head, neck and chest, the disorder in the room where she had been murdered, and the appearance of the body indicating that she had been raped after she was shot to death. The fact that she was raped and had sodomy committed upon her, and forcefully so, was shown by the condition of the body, the condition of the

vaginal canal and the rectum, and the lack of any clothing except for her slip, which was pulled up exposing her genitals.

The jury was not required to conjecture that the intercourse had been with consent. (*People* v. *Reed,* 38 Cal.2d 423, 431 [5] [240 P.2d 590].) This is particularly true since there was no evidence of previous acquaintanceship between defendant and Mrs. Sterling and defendant entered her home armed with a deadly weapon. The evidence of force exerted upon the victim belies any theory of consensual sexual intercourse, despite the absence of injury to the vaginal and rectal areas, and is consistent with the prosecution's theory that she was probably dead at the time of the sexual acts. Thus, the evidence was sufficient to support a finding of specific intent to commit rape. (*People* v. *Hillery, supra,* 62 Cal.2d 692, 704-705 [8] ; *People* v. *Kemp,* 55 Cal.2d 458, 472 [7] [11 Cal.Rptr. 361, 359 P.2d 913] ; *People* v. *Reed, supra,* at p. 431 [3-5].)

The evidence supports a finding that defendant committed burglary because he entered the Sterling residence with the specific intent of committing an assault with a deadly weapon, rape and sodomy. This conclusion is inescapable from the evidence that he armed himself with a Colt weapon, entered the Sterling residence and committed both rape and sodomy upon his victim. (*People* v. *Sears, supra,* 62 Cal.2d 737, 745 [12a-13].)

There being no error in the introduction of evidence, and the evidence of murder in the perpetration of burglary and rape having been established, the prosecutor properly postulated this theory in his opening statement by informing the jury what the People intended to prove. (*People* v. *Jones,* 225 Cal.App.2d 598, 609 [8] [37 Cal.Rptr. 454].)

Second, *that he was denied the right of effective counsel.*

This contention is also without merit. It is argued that the trial court committed reversible error in denying defendant's personal motion to dismiss the public defender and appoint other counsel from the bar association and in denying his motion to allow him to appear in propria persona when the above motion was denied.

The record reveals that defendant made no motion to represent himself but only moved to have the public defender dismissed and other counsel appointed.[1]

---

[1] On August 29, 1966, in department 110 of the superior court, Judge Fraser presiding, the case was called for trial and both sides answered "Ready." At that time the following occurred:

The cases of *People* v. *Byoune,* 65 Cal.2d 345 [54 Cal.Rptr. 749, 420 P.2d 221], and *People* v. *Crovedi,* 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868], relied on by defendant, wherein we held that the constitutional right to counsel comprehends a right to appear and defend with retained counsel of one's own choice, are distinguishable. Defendant here did not seek substitution of a particular private attorney of his own choosing; rather he sought appointment of private counsel, and failed to give any specific reason why the public defender could not adequately defend him. (*People* v. *Massie,* 66 Cal.2d 899, 910 [10] [59 Cal.Rptr. 733, 428 P.2d 869].)

The trial judge properly denied defendant's motion to dismiss the public defender and have other counsel appointed. Defendant was well and ably represented by the public defender and therefore was not denied the right to effective counsel guaranteed by the state and federal Constitutions.

Third, *that evidence was admitted that was the product of an unlawful search and seizure.*

This contention is without merit. Defendant claims that the gun and holster and the testimony relative to his palm prints on the paper sack in which they were wrapped were inadmissible evidence because the bag, gun and holster were illegally seized in a search made pursuant to an invalid search warrant. He argues that the search warrant specified a "rifle, and other guns and firearms and ammunition," and that the affidavit in support of the search warrant did not state sufficient

"THE DEFENDANT: At this time, your Honor, I would like at this point to discharge Mr. Nunnelley as my attorney. And the reasons, if I may give them.

"THE COURT: Do you have the funds with which to employ an—

"THE DEFENDANT: I would like to ask that an attorney be appointed from the Bar Association.

"THE COURT: I can't do that. The Public Defender represents people who are unable to employ other attorneys unless there is a conflict of interest where there are two defendants and the Public Defender represents one and the two defendants' interests are conflicting, and then we do appoint an outside attorney, but where there is only one defendant, the Public Defender acts as attorney, and I might say to you, Mr. Tolbert, Mr. Nunnelley has been known to this Court for many years and he is a very able and conscientious and highly regarded lawyer. I don't know anyone who can probably handle the matter better than he can.

"THE DEFENDANT: With due respect for the Court's opinion, I do not go along with this. It is not my conclusion. He has not shown me this.

"THE COURT: Mr. Nunnelley will remain as the attorney unless you are able to arrange with private counsel on your own basis, but the Court cannot appoint private counsel.

"THE DEFENDANT: May the record show that I am emphatically against having him represent me any further?

"THE COURT: The record will show that you have made that statement, yes. The defendant will be remanded to the custody of the sheriff."

facts to constitute probable cause to believe that these weapons were used as a means of committing a felony or were items of evidence tending to show a felony had been committed and that defendant had committed a felony.

The gist of defendant's argument is that when the officers obtained a search warrant after his arrest, the only object of their search was the rifle or shotgun described by Miss Ryan as the one with which she was assaulted and that the officers could not search for any firearm except one the shape and size of the rifle or shotgun. This argument is not well taken.

■ Defendant had an opportunity to attack the sufficiency of the search warrant during the trial (*People* v. *Butler*, 64 Cal.2d 842, 843-844 [1] [52 Cal.Rptr. 4, 415 P.2d 819]) and, failing to do so, cannot now argue the matter for the first time on appeal. ■ Moreover, the police had the following information regarding defendant at the time of his arrest: He had been positively identified by Miss Ryan as the man who had kidnaped her at gunpoint, inferably for the purpose of rape, a few blocks away. A few days later a young woman living next door to defendant had been raped and murdered by means of a firearm. Defendant was an ex-convict. Based on these facts, police officers had reasonable cause to believe that defendant had committed the following crimes: assault with a deadly weapon, kidnaping, burglary, rape, murder, and was an ex-convict with a gun.

There was ample ground to support the issuance of a search warrant,[2] and the police were authorized to look for and seize the gun and holster found concealed in the bathroom of the house where defendant was staying.

■ There was no legitimate issue of unreasonable search and seizure during the trial, for the public defender, with 21 years' experience made no objection to the introduction of the

---

[2]Section 1524 of the Penal Code provides: "A search warrant may be issued upon any of the following grounds:

". . . . . . . . . . . .

"2. When the property or things were used as the means of committing a felony.

"3. When the property or things are in the possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he may have delivered it for the purpose of concealing it or preventing its being discovered.

"4. When the property or things to be seized consist of any item or constitutes any evidence which tends to show a felony has been committed, or tends to show that a particular person has committed a felony. . . . "The property or things described in this section may be taken on the warrant from any place, or from any person in whose possession it may be."

murder weapon or the expert testimony with regard to defendant's palm print on the paper bag. In addition, the search was consented to by the owner of the house.[3]

Fourth, *that the trial court committed prejudicial error in allowing into evidence hearsay regarding the murder weapon.*

This contention is without merit. Defendant contends that his responses to Mrs. Ferguson's questions after the discovery of the gun and holster were inadmissible hearsay and that his counsel was inexcusably ignorant in failing to object thereto. He argues that therefore the point may be raised on appeal despite failure to object, citing *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].

The holding in *Ibarra* was that a defendant is denied the effective aid of counsel to which he is constitutionally entitled when, through inexcusable ignorance of a rule of law, his counsel's failure to object to allegedly illegally seized evidence results in withdrawing a crucial defense from the case. *Ibarra* is not applicable to the facts of the present case.

Defense counsel here did not object to Mrs. Ferguson's testimony, because it was admissible under a well-recognized exception to the hearsay rule. Accusatory statements and the defendant's responses thereto may be received where, under circumstances calling for a denial, there were equivocal or evasive answers indicating a consciousness of guilt or acquiescence in the truth of the statements. (*People* v. *Whitehorn,* 60 Cal.2d 256, 262 [3] [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Davis,* 48 Cal.2d 241, 249-250 [8] [309 P.2d 1]; see Witkin, Cal. Evidence (1966) § 529, pp. 501-502.)

Mrs. Ferguson testified that when defendant telephoned her after his arrest she told him that officers had found a gun in the bathroom of her house. She asked him if he had put it there, and he said "Forget about it." On other occasions she asked him, "Was that your gun?" and he replied, "Just forget about it." Therefore, under circumstances calling for a denial, defendant's equivocal and evasive

[3]*Bumper* v. *North Carolina,* 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], where it was found that consent was not voluntarily given, is not applicable to the facts in this case. In *Bumper* there was evidence that the defendant's grandmother had been told by an officer that he had a search warrant and that she permitted the search of her home only because she took him at his word. The prosecution was not relying upon a search warrant to justify the search but solely upon consent to search. In the present case there is nothing in the record to show that Mrs. Ferguson was influenced to consent to the search because of the warrant. In fact, she testified that she gave the officers permission to enter "because I didn't know what they were coming for."

responses indicated acquiescence in the truth of the accusatory statement.

Fifth, *that there was abuse of discretion in the admission of two colored photographs showing the position of the deceased at the time the body was discovered.*

These photographs were admitted into evidence without objection, and there was no occasion for the trial court to exercise its discretion to determine whether the evidence would be prejudicial or not.

It was the People's theory that the victim was murdered during the commission of the crimes of rape and sodomy and that the acts were performed after the victim was dead. The district attorney called the jurors' attention to the pictures to support his theory. On the other hand, the defense hypothesized that because the victim had not suffered injuries to the vagina the sexual activity had been voluntary and the killing occurred as the result of a lovers' quarrel.

The photographs support the theory of the prosecution and completely refute the theory of the defense. The photographs were relevant to meet the burden of proving burglary and rape to support a finding of first degree murder. One photograph depicts the victim lying on the floor with her back to the camera. Bloodstains are visible on her back, on the floor, on the back of her slip, and on the floor by her feet. It shows that her slip and upper garment were pulled up to the waist, with the lower part of the slip barely covering the lower portion of her body and that she was barefooted. A yellow top garment is lying by her knees. The other photograph is of the front of the victim; it shows that she is wearing no pants; that her slip had been pulled above her private parts; and that blood flowed from the area under her head and upper body to her knees. The evidence was properly admitted. (*People* v. *Cheary,* 48 Cal.2d 301, 311-312 [7-10] [309 P.2d 431] ; *People* v. *Arguello,* 65 Cal.2d 768, 775-776 [8-9] [56 Cal.Rptr. 274, 423 P.2d 202].)

Sixth, *that the trial court erred in improperly screening the jury on the issue of conscientious objection to the death penalty.*

Defendant claims that it was reversible error for the trial judge to discuss with prospective jurors the matter of their possibly having to decide a death sentence before the issue of first degree murder was decided because such discussion had the tendency to imply that the trial judge felt that defendant was guilty.

This contention is without merit. A similar argument was made in *People* v. *Cheary, supra,* 48 Cal.2d 301. It was contended that the trial court committed prejudicial error in asking prospective jurors whether they entertained conscientious opinions that would preclude their voting for a verdict carrying the death penalty, that the death penalty was overemphasized, and that the trial court lent its authority to the propriety of the death penalty. We said, at page 311 [6]: "The choice by the jury between the possible punishments for first degree murder is to be made during and not before the jury's deliberation on that question. We recently held, therefore, that a juror who entertains views formulated before trial that compel him to vote for one of the two possible punishments regardless of what the evidence at the trial may reveal should be excused. (*People* v. *Riser,* 47 Cal.2d 566, 575-576 [305 P.2d 1].) . . . the tenor of the discussion affords no reason to believe that the death penalty was overemphasized or that the jurors thought that the court was endorsing the death penalty. . . ."

During the course of the trial judge's remarks regarding the death penalty in the present case, he admonished the jury: "Let's make it quite clear. The fact that I discussed this case, this situation with you is no way an indication that I feel it may ever be necessary for you to discuss life and death or to have a penalty hearing in this case. I do not know what your conclusion will be on the guilt phase.

"But, you see, I have already told you that it is the same jury that proceeds with the penalty phase. That being the case, there is only one opportunity for *voir dire,* one time when the counsel and the court can ask you about your feelings on these matters; and it must be done at this time prior to the commencement of the first trial.

"So, therefore, it is necessary to discuss with you all of these matters, assuming the potential, you see, even the potential of a penalty phase.

"Do not read into this discussion that I and the counsel will have with you on your feelings with respect to capital punishment, and what have you, the fact that the Court feels that it may ever be necessary for you to have a penalty phase. I do not know anything much. As a matter of fact, I know nothing more about the evidence than you do at the present time. It is just my duty, even as it is the duty of counsel, to in the interests of this client, to discuss these matters with you in advance.

"

"THE COURT: Now, just one final matter and then we will resume our questioning of Mr. Huchinson.

"It might occur to you to ask why is the Judge discussing with us the issue of potential death penalty before the case has even proceeded to the issue of guilt or innocence. Does that meant that the Judge has a feeling that that is going to be necessary? Or just why is he discussing it?

"Let's make that very clear.

"I have no knowledge whatever about this case. As a matter of fact, I don't know any of the facts of it whatever other than what I have read to you, so now we both know exactly the same."

There was nothing in the court's remarks that tended in the slightest degree to imply that he thought defendant was guilty, and he stressed to the prospective jurors that it would be manifestly unfair to both sides should any of them entertain a preconceived notion of defendant's guilt before hearing all the evidence.

▮▮▮▮▮ After this court unanimously decided that the judgment should be affirmed, we withheld filing the opinion to await the decision of the United States Supreme Court in *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and thereafter permitted counsel to file additional briefs in light of that decision.

While the trial of this case preceded *Witherspoon* by almost two years, the trial judge employed the correct test in determining that veniremen excused for cause were disqualified. There was no error of the type condemned in *Witherspoon* in the selection of the jury that imposed the death penalty in the present case.

Before any veniremen were examined by counsel on *voir dire,* the court informed them that only in the event that defendant were found guilty of first degree murder would they be called upon to consider the question of punishment. He informed them that because of the alternative penalties provided by state law, a juror who was of the frame of mind that "he could never *under any circumstances* bring back the death penalty" would fall into the category of a "conscientious objector." He further said that "if you feel that *under no circumstances,* sitting here right now, not having heard any evidence, that there was nothing that could be presented to you, regardless of how shocking or aggravating it may be, that could persuade you from a viewpoint that you could not

bring back the death penalty, obviously you would have a conscientious objection. And if that were the case, you would not be qualified to serve in a death penalty proceeding.'' He defined a conscientious objector: ''. . . a conscientious objector would be defined, generally speaking, as *one who could not bring back the death penalty against anyone regardless of what the evidence might be.* Regardless of how aggravated the circumstances of the case might be, still, whether it would be for religious reasons or moral reasons, whatever it may be, the juror *could not, under any circumstances, ever* join with fellow jurors in bringing back the death penalty.

''If that were true, that would not present an open mind at the outset and would disqualify you for service upon this kind of jury.

''*Now, that is not the same thing, by any means, as saying that a person is disqualified from sitting upon a jury because he might not believe in the death penalty or feels that the law should be changed.*

''If the juror, even having those beliefs, is still willing to act under the law as it now exists, regardless of his own personal feelings, and feels that he can have an open mind, and if the case should, in his own opinion, be a proper case for the death penalty, and vote the death penalty, under those circumstances your feelings about the death penalty would be unimportant. . . . The opinions are not important, it is the capacity that you have, the ability that you have to follow the law and to retain an open mind upon this issue until all has been heard upon it.'' (Italics added.)

From the above-quoted remarks, it is clear that the court would not have sustained prosecution challenges for cause for mere opposition to the death penalty, nor would the court, on its own motion, have excused veniremen who said that they did not believe in the death penalty. The four disqualified veniremen made it unmistakably clear that they would under no circumstances vote for the death penalty. The *voir dire* examination follows:

1. ''THE COURT: . . . Do any of you that fall into that category feel you might have such a conscientious objection? MR. ENGESSER: I think I do. THE COURT: You are Mr. Engesser? Do you feel you could not bring back a death penalty *under any circumstances?* MR. ENGESSER: I don't think I would want to. THE COURT: Well, there are a lot of things we don't want to do, perhaps even serve on a jury sometimes. But we do take an obligation, and we do it. The question is if

you served upon the jury, and you felt that it was an appropriate, proper case for it, would you? Mr. Engesser: *Not for a death penalty.* The Court: I think perhaps, in view of Mr. Engesser's statement I should allow counsel to address questions to him if you wish to do so. Mr. Nunnelley? Mr. Nunnelley [defense counsel]: I submit. Mr. Finnerty [prosecutor]: Well, *you understand, sir, that what is or is not a proper case for the death penalty is left to the jury to decide.* Do you understand that from what the judge has said? Mr. Engesser: Yes, sir. Mr. Finnerty: And if, after listening to all of the evidence, and remembering there are no standards except your own conscience, if you felt this was a proper case for the death penalty, *could you so vote?* Mr. Engesser: *No,* because it involves my own conscience." (Italics added.)

2. "The Court: You have heard all the various questions which I and Mr. Finnerty and Mr. Nunnelley have addressed to your colleagues in the jury box, and their answers? Mrs. Kitchen: Yes. The Court: Reflecting upon them, ma'am, would you answer any of them differently or substantially differently than of the other jurors? Mrs. Kitchen: I would answer all of them the same with the exception of the death penalty. The Court: What about that? Mrs. Kitchen: I do have objections to it. The Court: In other words, you do know of a reason why you could not serve upon the jury? Mrs. Kitchen: Yes. I do. The Court: I thought I put that question first. You do have a conscientious objection, do you, to the imposition of the death penalty? Mrs. Kitchen: Yes. I do. The Court: You heard the way I defined that earlier. You could not bring back a death penalty *under any circumstances and regardless of the evidence* presented? Mrs. Kitchen: No, I couldn't." (Italics added.)

3. "The Court: Mrs. Schraga, could you be a juror in this case? . . . Mrs. Schraga: I don't think so. The Court: Why not? Mrs. Schraga: *Well, I couldn't never vote for the death penalty.* The Court: *Under no circumstances?* Mrs. Schraga: No, sir." (Italics added.)

4. Before prospective juror Cobb was examined individually he said, "I would like to be dismissed because of my feeling on capital punishment. The Court: Do I understand that those feelings are a conscientious objection, sir? Mr. Cobb: Yes, sir. The Court: And you feel you could not invoke the death penalty *under any circumstances?* Mr. Cobb: Yes, sir." (Italics added.)

That the jury in the present case was not "death-penalty

oriented'' is obvious from the fact that at least two members of the jury stated on *voir dire* that they would not like to impose the death penalty. Juror Cahill was asked by defense counsel: ''You wouldn't like to give somebody the death penalty, would you? MR. CAHILL: No.'' Another juror was asked by the prosecution: ''Now, I assume that you wouldn't want to give anyone the death penalty. You wouldn't like to do that; would you? MRS. FENGLER: No, I wouldn't like to.''

 The further argument made by defendant that a new jury should be impaneled for the trial on the issue of penalty has been considered numerous times and was recently again rejected in *People* v. *Gonzales,* 66 Cal.2d 482, 499 [58 Cal. Rptr. 361, 426 P.2d 929]: ''. . . the Legislature through its enactment of section 190.1 of the Penal Code . . . expressed a preference for a single jury qualified to act throughout both phases of a case involving the death penalty. 'Such legislative preference for the same jury at both trials deprives the defendant neither of due process nor of the right to an impartial jury. Since all of the evidence properly introduced at the trial on the issue of guilt is relevant in determining the penalty (Pen. Code, § 190.1), having the same jury avoids repetition of evidence and is thus not an arbitrary requirement.' [Citations.] ''

Seventh, *that the trial court committed reversible error in allowing the district attorney to attempt to instruct the jury on voir dire on the matter of viewing sex evidence with caution.*

 There was no misconduct on the part of the district attorney. There was no objection on the part of the defense, and the issue has been waived. (*People* v. *Wein,* 50 Cal.2d 383, 395 [4] [326 P.2d 457].)

During the *voir dire* of the jury, the following occurred:

''MR. FINNERTY [deputy district attorney]: Now, in the course of your lifetime have you had occasion to see these flashing yellow signals that—as you drive—to indicate caution?

''MR. ANDREWS: Yes.

''MR. FINNERTY: Now, that flashing yellow cautionary signal, that doesn't mean you have to stop; does it?

''MR. ANDREWS: No.

''MR. FINNERTY: It just means be careful, be cautious. Now, if the Judge gives you a cautionary instruction—and it is usually done whenever there is any element of sex in the lawsuit because the very nature of sex is such that there are

usually only two people present, and it is very difficult to get any kind of corroboration—so usually the Judge, with reference to any sex evidence, says to view it with caution.

"Now that doesn't mean to you to disbelieve. It means careful the way the yellow blinking light means careful; right?

"MR. ANDREWS: Right."

It is clear from the foregoing that the district attorney was not attempting to ascertain the knowledge or ignorance of a prospective juror on questions of law, thereby usurping the function of the trial judge to adequately instruct on the applicable law (*People* v. *Love*, 53 Cal.2d 843, 851-852 [5] [3 Cal.Rptr. 665, 350 P.2d 705]), but that his questions were for the purpose of determining whether the juror would follow an instruction to view uncorroborated evidence with caution rather than disbelieve it entirely. In *People* v. *Wein, supra,* 50 Cal.2d 383, 394-395 [2], we said: "Defendant also deems portions of the prosecutor's explanation of the law applicable to the case to have been prejudicial. However, the prosecutor properly used such explanation as the basis for hypothetical questions to determine whether the jurors would follow the instructions of the court [citation] and to ascertain their state of mind on the issues to be presented."

The district attorney was not concerned with a matter of substantive law but with the reception and use of evidence, and it was proper for him on *voir dire* examination to attempt to determine whether the juror would follow the instruction of the trial court.

Eighth, *that it was reversible error to admit proof of prior crimes at the penalty phase of the trial.*

There is no merit to this contention. Defendant contends that because he admitted the prior convictions at the time of his arraignment, no reference could thereafter be made to them in the penalty trial, citing section 1025 of the Penal Code.[4] The admissibility of evidence at the penalty trial is not governed by section 1025, but by section 190.1 of the Penal Code, which, after providing for the separation of the trial on the issues of guilt and the penalty, reads: "Evi-

---

[4]Section 1025 reads: "When a defendant who is charged in the accusatory pleading with having suffered a previous conviction pleads either guilty or not guilty of the offense charged against him, he must be asked whether he has suffered such previous conviction. . . . In case the defendant pleads not guilty, and answers that he has suffered the previous conviction, the charge of the previous conviction must not be read to the jury, nor alluded to on the trial."

dence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty."

■ It is settled that proof of prior crimes is admissible during the penalty phase (*People* v. *Mitchell*, 63 Cal.2d 805, 815-817 [6a-10] [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Hamilton*, 60 Cal.2d 105, 129 [18] [32 Cal.Rptr. 4, 383 P.2d 412]) and that inquiry may be made into relevant circumstances surrounding earlier crimes of which a defendant was convicted (*People* v. *Hamilton*, *supra*, at p. 130).

■ Therefore, evidence that defendant had previously committed and been convicted of the crimes of "exconvict with a gun" in Nevada in 1952, and assault with a deadly weapon in California in 1961, and evidence of the circumstances surrounding the latter offense, was properly admitted.

The jurors were properly instructed that they must be convinced beyond a reasonable doubt that defendant had committed the prior crimes. (*People* v. *Hillery*, 65 Cal.2d 795, 805 [7] [56 Cal.Rptr. 280, 423 P.2d 208]; *People* v. *Tahl*, 65 Cal.2d 719, 738 [12] [56 Cal.Rptr. 318, 423 P.2d 246]; *People* v. *Polk*, 63 Cal.2d 443, 450-451 [11] [47 Cal.Rptr. 1, 406 P.2d 641].)

The judgment of conviction and imposition of the death penalty are affirmed.

· Traynor, C. J., Tobriner, J. Mosk, J., Burke, J., and Sullivan, J., concurred.

PETERS, J.—I concur in the majority opinion insofar as it affirms the judgment of guilt, but I dissent insofar as the majority affirms the imposition of the death penalty.

I cannot agree with the majority that the trial court properly excused for cause prospective jurors who were of the view that never, under any circumstances, could they return a death penalty. In doing so, the majority has repudiated the reasoning of *In re Anderson*, 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], which requires that the jury in a death penalty case must reflect the conscience of the community on the ultimate question of life and death. Although I dissented in *Anderson*, I have accepted the binding force of that decision (see e.g., *People* v. *Aikens*, *ante*, pp. 369, 380 [74 Cal.Rptr. 882, 450 P.2d 258] 394); however, the majority by

its decision today indicates that the reasoning of the decision is not binding.

In *In re Anderson, supra* 69 Cal.2d 613, the majority reaffirmed the view that the Legislature has entrusted to the absolute discretion of the trier of fact the awesome decision between life imprisonment and death for first degree murder and that the Legislature has not established any standards to guide the trier of fact or limited in any way the absolute discretion of the trier of fact to determine which of the two penalties to impose. (69 Cal.2d at pp. 622-623.)

The absence of any standards means that to a large extent the members of the jury will be guided by their predilections relating to the proper function of the death penalty in our modern society. This is recognized by the majority in *Anderson*. "The Legislature, by entrusting to the absolute discretion of the jury the decision between life imprisonment and death has indicated its belief that jurors understand the factors that are relevant to such a decision." 69 Cal.2d at p. 625.) And the majority quoted from *Witherspoon v. Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], as follows: " '. . . . a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life and death,'[15] and footnote 15 reads in part '[Illinois] has deliberately "made . . . the death penalty . . . an optional form of punishment which [the jury remains] free to select or reject as it [sees] fit." [Citation.] And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society." ' " 69 Cal.2d at pp. 627.

The conclusion is inescapable that, in committing the choice of penalty to the absolute discretion of the trier of fact because the jurors would understand the factors relevant to such a decision and because in this way a link would be maintained between contemporary community values and the penalty system, the legislative intent was to give effect to the jurors' predilections relating to the death penalty, not to ignore or silence them.[1]

---

[1]To those, as we, who have had the burden to review death penalty cases, it is apparent that the predilections of jurors with regard to the

It is even clearer, if anything could be, that we do not maintain a link between contemporary community values and the penal system by stacking the deck and excluding for cause a substantial segment of the community solely on the basis that their views on the death penalty will result in a penalty of life imprisonment. Exclusion of jurors for cause solely because their views on the death penalty will determine their vote at the penalty portion of the trial eliminates the possibility that the jury will reflect contemporary community values in its determination of the appropriate penalty.

It is downright inconsistent for the majority to attempt to sustain the validity of the death penalty as administered in California on the theory set forth in *Anderson* that leaving the determination of penalty to the jury without standards is not invalid because the Legislature could properly seek in this manner to maintain a link between community values and the penalty system and for the majority at the same time to exclude for cause the substantial segment of the community who oppose the death penalty in all circumstances.

---

imposition of the death penalty run a wide gamut. On the one extreme, apart from those who do not believe that they would ever impose the death penalty, there are those who would greatly limit the death penalty to cases where an inmate having suffered prior convictions and already serving a sentence of life imprisonment, perhaps without possibility of parole, kills a guard. Others would limit the imposition of the maximum penalty to cases where the defendant has committed a sexual or non-economic crime or to where the defendant had previously committed a violent crime. Still others to where the defendant has committed an economic crime not the product of lust or anger. To the opposite extreme, some may feel that the principle of an eye for an eye should ordinarily govern and that he who kills should also die in the absence of peculiar and mitigating circumstances. Others may believe that the more heinous crime is where the victim lives but because of the crime is mentally incapacitated or physically maimed and that life imprisonment should not be imposed in such situations. There may be some who feel that life is the greater penalty and that death would involve an end to suffering and is not a substantial penalty. There are also many prospective jurors who have never given full consideration as to their attitude on the death penalty, and these jurors may not be able at the time of *voir dire* to state their attitude to the penalty although during the trial they may develop rigid and extreme positions as to propriety or impropriety of the imposition of life or death. Without further laboring the point, it is clear that the predilections of jurors as to the propriety of the imposition of the death penalty or life imprisonment as an abstract matter are numerous and varied and the determination in a specific case by a particular juror as to which of the two penalties is appropriate may be based on a *single consideration or numerous considerations*, many of which would be found to be unreasonable by other members of our society. It is probably sufficient to recognize that, as has been pointed out, "any particular factor may influence any two jurors in precisely the opposite manner." (*People* v. *Hines*, 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398].)

In holding that jurors may be excluded for cause when they are opposed to the imposition of the death penalty in any circumstances, the majority is not applying any statutory rule but one fashioned by the court itself, and it is a rule which is directly contrary to the legislative direction. Challenge of jurors for bias is covered by section 1073 et seq., of the Penal Code.

Section 1073 of the Penal Code provides: "Particular causes of challenge are of two kinds:

"First. For such a bias as, when the existence of the facts is ascertained, in judgment of law disqualifies the juror, and which is known in this code as implied bias.

"Second. For the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, which is known in this code as actual bias."

Section 1074 of that code provides: "A challenge for implied bias may be taken for all or any of the following causes, *and for no other*: . . .

"8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror." (Italics added.)

The language of the statute is unmistakably clear that challenge for cause because of conscientious opinions against the death penalty will lie where those opinions would preclude finding the defendant guilty. There is no provision in section 1074 for exclusion of jurors whose opinions would permit them to find a defendant guilty but would not permit them to impose the death penalty, and the language of the section excluding court-adopted additions to the challenges for implied bias, "and for no other," is clear, unambiguous, and not subject to construction. The language of the statute shows that the Legislature did not intend, with the one exception therein, to exclude jurors for views as to the death penalty.

Nor may it properly be concluded that a juror who has opinions against the death penalty which would preclude him in any circumstances from imposing the death penalty may be excused for actual bias under the statutes. The implied bias section specifically deals with the jurors who have objections against the death penalty and establishes the rule that such jurors are biased only when those objections would preclude a

finding of guilt. There simply is no basis for assuming that the Legislature intended that a conscientious opinion as to penalty which would not preclude a finding of guilt but only affect the determination of penalty should be viewed as actual bias.

Moreover, application of the actual bias provision to opinions regarding the imposition of the death penalty would create an absurd situation. The actual bias provision excludes a juror for the existence of a state of mind "which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party." In the absence of any standards as to imposition of the death penalty, it seems impossible to determine whether a juror is impartial unless we assume that any opinion as to the appropriateness of the death penalty shows partiality. Such an assumption would disqualify any juror who had previously decided that the death penalty was appropriate or inappropriate in some situations. Views with respect to the desirability of the death penalty are so widely held that application of the actual bias provision of the code section would exclude most prospective jurors for views for or against the death penalty and the *voir dire* of a prospective juror would become a lengthy trial in itself.

I am not unaware that there is a long line of case law in this state that a juror may be excused for cause because of conscientious opinions opposed to the death penalty where such opinions would not preclude a finding of guilt. The first of the cases reasoned that since the jury should only return life imprisonment if there were special circumstances warranting a lesser punishment, a juror having general scruples against the death penalty should be excluded. (*People* v. *Rollins,* 179 Cal. 793, 795-796 [179 P. 209].) Although the rule requiring mitigating circumstances to justify fixing the penalty at life imprisonment was subsequently repudiated (*People* v. *Green,* 47 Cal.2d 209, 217-232 [302 P.2d 307]), this court retained the rule that a juror having scruples against the death penalty should be excluded for cause, reasoning that a juror should be in a position prior to trial to impose either penalty, that to permit jurors having such scruples to serve would work a de facto abolition of the death penalty and that it would be inappropriate for this court to achieve such a result by construction (*People* v. *Riser,* 47 Cal.2d 566, 573-576 [305 P.2d 1]). A number of subsequent cases have rejected a contention that the addition of section 190.1 of the Penal

Code showed a legislative intention to permit jurors having conscientious scruples against the death penalty to serve. (*People* v. *Gonzales,* 66 Cal.2d 482, 498-499 [58 Cal.Rptr. 361, 426 P.2d 929] ; *People* v. *Nicolaus,* 65 Cal.2d 866, 882-883 [56 Cal.Rptr. 635, 423 P.2d 787] ; *People* v. *Thomas,* 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233] ; *People* v. *Smith,* 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222] ; *People* v. *Gilbert,* 63 Cal.2d 690, 711-712. [47 Cal.Rptr. 909, 408 P.2d 365].)

All of the reasons offered for extending the challenge for cause to jurors who have conscientious objections to the death penalty are questionable in the light of *Anderson* and *Witherspoon.* The argument that section 190 of the Penal Code requires that the juror be in a position to choose between the penalties in the light of the evidence before him is of questionable validity because, as demonstrated above and shown by *Anderson,* the Legislature has intentionally left in large measure the question of imposition of the penalty to the predilections of the jurors and has shown no intent to discriminate amongst those predilections. In a particular case, the preconceived predilection of a juror may compel his choice of either life or death whether or not in some other case he might find in favor of the other penalty and whether or not other jurors may have directly contrary predilections in each case. There is nothing to indicate that the Legislature intended to exclude all jurors who had previously considered the question of the propriety of the death penalty and reached some conclusions. Nor is there anything to indicate that the Legislature intended to exclude some of such jurors. To the contrary, the indication is that the Legislature, as pointed out in *Anderson,* intended a jury which would reflect community views.

Nor can I agree that we would abolish capital punishment in this state by following the language of the statute and holding that a prospective juror may not be excluded for cause on the grounds of conscientious scruples against the death penalty unless those scruples would preclude finding the defendant guilty. The dissenting justices in *Witherspoon* suggested that the rule adopted by the majority in that case would make "it impossible for States to get juries that will enforce the death penalty." (391 U.S. at p. 532 [20 L.Ed.2d at p. 791].) Yet in the instant case the jury was selected in compliance with *Witherspoon,* and nevertheless voted in favor of the death penalty. Similarly, adherence to section 1074 will

not automatically preclude imposition of the death penalty; it may make it more difficult to obtain a death penalty, but, this would be true only if there is a substantial and growing part of the public opposed to the death penalty. If there is such a part of the public, the rationale, offered in *Anderson* to justify granting the trier of fact absolute discretion as to penalty, requires that the opposition to the death penalty be given effect as reflecting community standards.

The broad rule of exclusion of jurors established by the prior cases has recently been overruled by *Witherspoon* v. *Illinois, supra,* 391 U.S. 510. (*In re Anderson, supra,* 69 Cal.2d 613, 619.) The rule followed by the majority in the instant case, excluding for cause jurors who are opposed to imposition of the death penalty in any circumstances, is not the rule which was followed in this state prior to *Witherspoon,* and arguments based on long standing judicial construction are no longer in point.

In the light of the fact that the long existing rule in this state as to exclusion of jurors on the basis of their views as to the death penalty is abrogated by *Witherspoon,* we should reexamine the question whether a juror may be excluded for such views. When this is done in accordance with the unmistakable language used by the Legislature in section 1074 and the reasoning of the majority in *Anderson,* it is clear that a juror may be excused on the basis of his views on the death penalty only where his views would preclude a finding of guilt. None of the jurors excused for cause in the present case on the basis of their views as to penalty indicated that they could not impartially determine the issue of guilt, and it was error to exclude them. The error requires reversal of the judgment insofar as it relates to penalty.

I would reverse the judgment insofar as it relates to penalty, and affirm in all other respects.