[Crim. No. 16534. Second Dist., Div. One. May 6, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ANNIE BLANKENSHIP, Defendant and Appellant.

## Counsel

Philip J. Catanzaro, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Russell Iungerich, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**LILLIE, J.**—Defendant was convicted by a jury of arson (§ 447a, Pen. Code) and arson with intent to defraud an insurer (§ 548, Pen. Code.) She appeals from the order granting probation.

Defendant, her 17-year-old grandson Steven and Elmo, a servant, lived at 8876 Lookout Mountain Drive in a two-story frame house built on stilts on a hillside. On August 22, 1967, Steve's girl friend, Diana, also 17, spent the day and that night there; in the late afternoon she and Steve were

in the kitchen talking about going to the laundromat when defendant told them to wait until the next day because she was planning to burn the house down the next day and wanted them to stay out of the house; Steve then asked if he should siphon some gasoline out of the car and defendant said, "okay." Diana saw Steve go out, siphon gasoline into a coffee can, take it downstairs and set it in the corner of the kitchen.

On August 23, 1967, Diana ate breakfast with defendant and Elmo, and at 11 a.m. drove with Steve and his friend Carl in his Mustang to the filming location of a hippie movie; they returned about 1 or 1:15 p.m. and Steve asked her to go into the house to get something; Diana went in but Elmo, who was standing in the center of the entry room, motioned for her to get out; the room was "all smoke" and it appeared to be coming from the other door leading down the stairs; she shut the door, went back to the car and they drove down the hill. They returned around 3 p.m. and Elmo, who was holding a grocery box, and defendant were standing in front of the house; they got into the car and all went to a Safeway store where they stayed 15 minutes and to a laundromat where they stayed five or six minutes, then returned by the back way, a small street with a driveway going down to a dirt road where Steve stopped, about a minute's travel from the house, and told Diana to get out and wait; when she got out she immediately saw evidence of the fire, heard fire engines and saw flames; because she had no watch she "guessed" the time to be 4:30 or 5 p.m. Forty-five minutes later Steve and Carl returned; she got in the car and Steve let her and Carl out at separate locations down the road, then drove back toward the house; when Steve, Carl, defendant and Elmo returned it was dark and they went to an apartment on LaBrea.

That night at the apartment defendant told Diana that she had a hard time and it took a long time getting the fire started, and that she tried to get it started by pouring gasoline on the floor and when the fire would not start she had to turn on the gas jet. In the service porch area Diana had seen a gas jet to which a washing machine and dryer once had been connected; she last saw the washer-dryer there about a month and a half before the fire. On December 3, defendant told her to keep her mouth shut about the fire if she wanted to go with her and Steve to Texas or Oklahoma.

Around 5:45 p.m. the fire department received a report of a fire at that address, went there and extinguished the fire in about 15 minutes. Around 6:30 p.m. Mr. Dianitto, arson investigator, arrived. He found various areas on the floor of the structure burnt through by fire; the hole burnt in the floor and the charring of the studs beneath indicated that a

flammable liquid or combustible-type material had been distributed on the floor to accelerate the fire; the burn running down the floor was significant because a fire customarily burns in an upward direction, not down; there was no flammable liquid source in the structure; both water heater and electric wiring were intact eliminating a fire from a faulty water heater or wiring; he found an open gas jet located in the service porch area which was the type that could not have turned on by itself, and was of the opinion that the valve had been opened prior to the fire. In the residence he found a noticeable lack of combustibles such as overstuffed couches, beds, chests of drawers and other items; the presence of furniture would tend to add fuel to the fire and aid in its extension. He formed the following opinions— that the fire had burned for a half hour to an hour; that the fire was aided by some type of accelerant (a flammable that would aid in spreading fire rapidly) because of the proportions the fire reached within the short period without the ordinary amount of combustible material; that the fire had been ignited by a human being, any natural, accidental or mechanical cause having been eliminated; and that the fire was caused by a flammable liquid distributed in the service porch area which had been ignited by an open burning flame from the gas jet emitting natural gas.

Identifying items listed on a document entitled "Liberty Mutual Proof of Loss," Diana testified that before the fire Steve's mother had taken certain furniture and household goods[1] out of the house, and had last seen these items on the premises toward the end of July 1967; that on the day before the fire she saw defendant take various other items[2] from the house, and she, Steve and Elmo assisted defendant in packing them in the trunk of the car; about two or three and one-half hours before, defendant said she was planning to burn the house down so she could get the insurance money.

Karen and Carol, defendant's neighbors, testified they had seen a moving van in front of defendant's house about two weeks before the fire; later when Karen went to defendant's house she noticed the drapes had been torn down; several times Carol went over to defendant's house to complain about the noise and when the door was open saw no furnishings inside other than a cot, pillows and record player.

---

[1]Reclining chair, small chair, rocker, desk, desk chair, end tables, round console cabinet buffet, electric clock, color television, portable television, electric drop fryer, electric broiler, Mixmaster, Sunbeam metal ironing board, steam iron, electric iron, toaster, moving picture camera, projector, Polaroid camera, two fishing rods and reels, radio, electric sewing machine, coffee table, large bed, twin beds, box springs, chest of drawers, large round mirror, vacuum cleaner, electric blankets, electric razor, bedroom chair, jeweled clock, electric clippers, children's coats.

[2]Spice set, records, towels, wash cloths, sheets and pillow cases, suits, slacks, jeans and jackets, shirts, sweater, socks, T-shirts, moccasins, leather boots and a ring.

The total amount of the claim defendant originally submitted to Liberty Mutual Insurance Company was $20,697.72; her proof of loss was based on that defendant claimed had been damaged and lost by the fire and upon her appraisal of the value; the maximum amount she was entitled to recover on her policy was $10,000; the policy covered only the contents of the house, not the house itself; in settlement defendant was paid $7,000; on November 30 she signed proof of loss form and release in settlement of claim in the presence of a notary and Steven Farkas, an adjustor for Liberty; Mr. Farkas took her to a bank that cashed the check and gave her $3,100 in $100 bills and the remainder in a cashier's check.

Defendant testified she moved to Lookout Mountain Drive on January 15, 1967, with her daughter, four grandchildren and Elmo; on August 22, 1967, she left for work around 6:30 p.m.; neither Steve nor Diana had been there; she returned around 8 a.m. on August 23d; between 2:45 and 3 p.m. she, Elmo and Steve took the Mustang to the washateria; around 6:15 or 6:30 on the way home, Steve had to pull over to let fire engines pass; the firemen would not allow her car to get near the house; she told Steve to turn around and come in the other way, then she and Elmo ran through the crowd up to the fire; as far as she knew Diana had been dropped off before; all items she listed on the insurance claim had been on the premises when the fire occurred; she had shipped the washing machine and dryer to her daughter in Texas. She and Diana had had constant and frequent arguments; on the morning of December 3 she told Diana she was going back to Texas or Oklahoma; she had collected the insurance check but did not mention the cash because she was afraid of Diana and Steve; the night before, she told Diana she was going but was not going to take her with her and Steve and Diana grabbed her purse and took all of her money, about $285; on May 29, 1967, her daughter had moved away because of Steve and Diana; Steve had struck his mother on more than one occasion and struck her quite a few times. Defendant had lived in Dallas, Texas, at 3209 McNeal Street, there had been a $25,000 loss in a fire at that address and no one was home at the time of the fire. She denied that she either helped or assisted in putting anything in the trunk of the Mustang; that she said she was going to burn the house down; that she told Steve to get gasoline out of the car; that she burned the house down, that she ever told Diana she had a hard time getting the fire started or that she had tried to get it started by pouring gasoline on the floor and then turning on the gas jet; or that when Diana came back to the house around 1 or 1:15 there had been any smoke in the entry hall. Four of defendant's friends had been in the house two or three days before the fire and it appeared to be normally furnished; on August 23, around 3 or 4 p.m., they had been to the house but no one answered the doorbell.

After the fire defendant asked Allan to talk to Diana about going to Oklahoma; he asked her what she was going to do when defendant and Steve left; Diana said she was going with them and he said she wasn't; Diana said if she did not take her she was going to say defendant burned the house down; he said, "You know that Annie didn't burn the house down" and Diana replied, "I know, but if she doesn't take me she is not going either."

Appellant's sole contention is that the court committed prejudicial error in failing on its own motion to give a cautionary instruction concerning her alleged oral admissions. Conceding the repeal of section 2061, Code of Civil Procedure,[3] she argues that such instruction is still required and that this was a "proper occasion" for the cautionary instruction because the People relied solely upon Diana's testimony of her oral admissions to connect her with the fire, there were no eyewitnesses and no competent evidence that she set the fire, there were conflicts and inconsistencies in Diana's testimony and Diana was a hostile, bitter witness who could not be believed.

At the time of trial (March 1968) section 2061, Code of Civil Procedure, had been repealed (effective January 1, 1967). Under that statute such an instruction when called for by the evidence had to be given even without a request therefor. (*People* v. *Ford,* 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Terry,* 57 Cal.2d 538, 564 [21 Cal.Rptr. 185, 370 P.2d 985]; *People* v. *Deloney,* 41 Cal.2d 832, 840 [264 P.2d 532]; *People* v. *Bemis,* 33 Cal.2d 395, 399 [202 P.2d 82].) Law Revision Commission Comments suggest that the repeal of section 2061, Code of Civil Procedure, should have no effect on the decisional law requiring cautionary instructions (see *People* v. *Reed,* 270 Cal.App.2d 37, 43 [75 Cal.Rptr. 430]; Deering's Code Civ. Proc., Annot., §§ 1887-End (vol. 4) p. 629); however, in consideration of the record before us viewed in the light of article VI, section 13, California Constitution, *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243], *People* v. *Ford,* 60 Cal.2d 772, 800 [36 Cal.Rptr. 620, 388 P.2d 892], and *People* v. *Henderson,* 255 Cal.App.2d 513, 518 [63 Cal.Rptr. 164], we conclude that the court's failure to give the instruction was not prejudicial.

The basis of the requirement of the cautionary instruction on evidence of verbal admissions is found in the dangers inherent in the use of such evidence. " 'Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by the omission

---

[3]Section 2061, Code of Civil Procedure, provided in pertinent part that the jurors "are . . . to be instructed by the court on all proper occasions: . . . 4. That . . . the evidence of the oral admissions of a party [ought to be viewed] with caution; . . . "

or the changing of words, to convey a false impression of the language used. No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself.' " (*People* v. *Bemis,* 33 Cal.2d 395, 399 [202 P.2d 82].) The cautionary instruction, according to *Bemis,* is designed to aid the jury in determining whether an admission was in fact made. (P. 400.)

Here it was Diana who testified to all of defendant's oral admissions, and the evidence demonstrates that her recollection concerning them was accurate and that she neither was mistaken as to their substance nor perjured herself. (*People* v. *Hunter,* 1 Cal.App.3d 461, 465 [81 Cal.Rptr. 750].) The accuracy of her recollection and ability to relate defendant's oral admissions is supported by her further testimony of her personal observations, the truth of which is corroborated by the testimony of other witnesses—(1) Diana's testimony that on the day before the fire defendant told her she was planning to burn the house down so she could get the insurance money was corroborated by her further testimony that several hours later she saw defendant remove numerous household and personal items from the premises and helped her pack them in the trunk of the car and that about a month before the fire Steve's mother removed from the residence large quantities of household goods and furniture; the testimony of Carol and Karen that just prior to the fire they saw a lack of normal furniture in the house; the arson investigator's testimony that immediately after the fire he found in the remains of the burned house a noticeable lack of ordinary combustibles such as furniture; the absence of any other offered explanation as to why the furniture had been removed from the premises; and defendant's claim to Liberty that the furniture and household items had been destroyed or damaged in the fire for which she sought recovery of the face amount of the policy. (2) Diana's testimony that in defendant's kitchen the night before the fire defendant told her and Steve she planned to burn the house down the next day and wanted them out of the house, and when Steve asked if he should siphon gasoline from his car defendant said "okay," is corroborated by her further testimony that immediately thereafter she saw Steve siphon the gasoline into a coffee can, take it downstairs and place it in the corner of the kitchen and the testimony of the arson investigator that in his opinion the fire was started by a human agent by the distribution of a flammable liquid in the service porch area which had been ignited by an open burning flame from a gas jet. (3) Diana's testimony that on the same night defendant told her she had had a hard time and it took a long time getting the fire started and she tried to get it started by pouring gasoline on the floor and when the

fire would not start she had to turn on the gas jet, is corroborated by her further testimony concerning the gasoline which Steve took downstairs the night before, that around 1:15 p.m. the next day when she entered the house the entry room was "all smoke" which appeared to be coming from the other door leading down the stairs, and that around 4:30 or 5 p.m. when let out of the car, she immediately saw the flames and heard fire engines; and the testimony of the arson investigator that the hole burned in the floor and the charring of studs beneath indicated that a flammable liquid had been distributed on the floor to accelerate the fire in the service porch area, he found an open gas jet which in his opinion had been opened before the fire, and the fire had been ignited by a human being started by a flammable liquid distributed in the service porch area ignited by an open burning flame from a gas jet emitting natural gas. (4) Diana's testimony that on December 3, 1967, defendant told her to keep her mouth shut about the fire if she wanted to accompany her and Steve to Texas or Oklahoma is corroborated in part by defendant herself that on December 3 she told Diana she was going back to Texas or Oklahoma, and rather extensive defense testimony of the differences between her and Diana concerning whether Diana would accompany her and Steve to Oklahoma.

The foregoing evidence more than "strongly suggests" (*People* v. *Hunter*, 1 Cal.App.3d 461, 465 [81 Cal.Rptr. 750]) that defendant in fact did utter the admissions, that Diana made no mistake as to their substance, that Diana neither misrepresented nor misstated them and that regardless of the strained relations between her and defendant and her alleged motive for perjury, Diana did not lie. While claiming "conflicts and inconsistencies" to exist in Diana's testimony, appellant points to but one—that Diana said "that she saw the house burning almost immediately during the 45 minutes she was separated from Appellant and . . . that Appellant told her she had had a hard time starting the fire." We perceive no conflict here. Moreover, Diana testified that as early as 1:15 p.m. the entry room was "all smoke" coming from a door leading downstairs which tends to show that indeed defendant had difficulty in getting the fire to burn.

█ The circumstances in a given case determine whether the failure to give cautionary instructions *sua sponte* constitutes reversible error. (*People* v. *Henderson*, 255 Cal.App.2d 513, 518 [63 Cal.Rptr. 164].) █ Here expert testimony established that the fire started through a human agent by distribution of a flammable liquid ignited by an open gas jet, and an arson was committed; also the evidence established that defendant represented to Liberty that household and personal items and furniture which she knew had been removed from the premises before the fire had been damaged or destroyed by the fire for which the insurance company

paid her $7,000. Without her admissions there was ample circumstantial evidence to connect defendant with the commission of the crimes *(People v. Tolbert,* 70 Cal.2d 790, 800 [76 Cal.Rptr. 445, 452 P.2d 661]; *People v. Hillery,* 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]); here that evidence consisted of her motive and conduct. *(People v. Hays,* 101 Cal.App.2d 305, 311 [255 P.2d 600].) She had insured with Liberty the contents of the house and was the sole insured party under the policy; she was the only person with a motive for setting fire to the house. This evidence together with her removal of the items from the house the day before the fire, and the smoke in the entry room emanating from the downstairs while defendant was still on the premises around 1 p.m. is strong circumstantial evidence pointing to her guilt. ■ As to Diana, the jury saw her and heard her testify and assessing her credibility accepted her testimony rejecting defendant's denials; we will not reweigh the evidence, reappraise the credibility of witnesses or redetermine factual conflicts. *(People v. Perez,* 65 Cal.2d 709, 713 [56 Cal.Rptr. 312, 423 P.2d 240]; *People v. De Paula,* 43 Cal.2d 643, 649 [276 P.2d 600].) ■ The evidence convinces us that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the claimed error. *(People v. Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *People v. Hunter,* 1 Cal.App.3d 461, 466 [81 Cal.Rptr. 750].)

The order is affirmed.

Wood, P. J., and Gustafson, J., concurred.