Filed 10/24/14  P. v. Alvarez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>GUILLERMO ALVAREZ,<br><br>      Defendant and Appellant. | F066511<br><br>(Super. Ct. No. BF142939A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

J. Wilder Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Guillermo Alvarez appeals his convictions of torture, assault with a deadly weapon, infliction of corporal injury upon a cohabitant, and misdemeanor assault.  The asserted grounds for appeal pertain to an audio recording of a jailhouse conversation

between Alvarez and his mother during which his mother impliedly opined that he was guilty of a crime. Alvarez argues this evidence was irrelevant and unfairly prejudicial, and that its admission at trial constituted error under state law and/or a violation of his constitutional right to a fair trial. In the alternative, appellant claims ineffective assistance of counsel based on his trial attorney's failure to make adequate objections and offers of proof regarding the admissibility of the recording. Lastly, apart from challenging his convictions, Alvarez contends that the trial court erred by imposing a sentence of seven years to life in prison for the crime of torture. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Kern County District Attorney charged Alvarez by information with one count of torture (Pen. Code, § 206; Count 1), two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); Counts 2 and 3), and one count of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd (a); Count 4).[1] All charges stemmed from an incident that occurred on July 7, 2012 involving Alvarez and his then live-in girlfriend, Savannah Reyes (Savannah).[2] Enhancement allegations were attached to Counts 2 through 4 for personal infliction of great bodily injury under circumstances involving domestic violence during the commission of a felony (§ 12022.7, subd. (e)). The case was tried before a jury in October and November 2012.

Prosecution Case

Savannah was the prosecution's complaining witness. Her testimony included background information about her romantic relationship with Alvarez, which began when she was 17 years old and Alvarez was 21. As a single mother with a child from a prior relationship, Savannah was charmed by Alvarez's willingness to be a father figure in her

---

[1] All statutory references are to the Penal Code unless otherwise specified.
[2] Throughout this opinion, when we refer to individuals by their first names, we do so not out of disrespect, but to ease the reader's task.

2.

son's life. She moved in with him sometime around November 2011, shortly before her 18th birthday.

The couple's living arrangements were less than ideal since Alvarez also cohabitated with an ex-girlfriend, Nancy Alvarado (Nancy), and their two small children. With the addition of Savannah and her son, there were three adults and three children living together in a one-bedroom apartment, plus additional occupants whenever Alvarez's other children came to visit him (he had four children from three separate relationships). Alvarez allowed Savannah to stay with him rent-free and paid for "everything," including groceries, fuel for her car, and other living expenses. The situation became less appealing after Savannah learned that Alvarez was still having intermittent sexual relations with Nancy, but she tolerated his dalliances.

Alvarez was described as a controlling and abusive boyfriend. Savannah testified that Alvarez physically abused her at least 10 times during the months leading up to the events of July 7, 2012. In December 2011, Alvarez hit her in the face and kicked her in the head for allegedly lying to him. A few days later, on December 31, 2011, Alvarez instructed Nancy to fight Savannah because he was angry that Savannah had complained to her family about the way he treated her. When the fight was over, Alvarez took Savannah aside and told her to raise her hands. She complied, and Alvarez struck her with an aluminum bat in the stomach, ribs, and leg.

Savannah temporarily broke up with Alvarez and moved out of his apartment, but was back living with him again by summer 2012. The abuse continued. She recounted an incident from June 2012 during which Alvarez hit her in the face with a shoe and again forced her to endure a series of body blows from his aluminum bat. Fearing that her arm had been broken, Savannah asked to go to the hospital. Alvarez allowed Nancy to take Savannah to a local medical facility, but told the women to lie and say the injury had been caused by a bicycling accident.

On the afternoon of July 7, 2012, Alvarez became angry at Nancy and Savannah for failing to discipline their children. Directing his attention first to Nancy, Alvarez slapped and hit her several times. He later slapped Savannah, punched her in the jaw, and stomped on her midsection when she fell to the floor. Alvarez also picked up a baby walker and threw it down on top of Savannah while she was on the ground. He then told her to get up and go into the bathroom.

Nancy was washing blood out of her hair when Savannah entered the bathroom. She watched as Alvarez hit Nancy in the back with a metal pole from an unassembled shoe rack. A few minutes later, he struck Savannah in the shoulder with the same pole. When he was done administering the beatings, Alvarez left the apartment to go watch an Ultimate Fighting Championship (UFC) pay-per-view event with his father.

Alvarez returned home later in the evening and confronted Savannah about something he had seen on her Facebook page. He struck Savannah in the forehead with another pole from the unassembled shoe rack, and then retrieved his aluminum bat. As he had done in the past, Alvarez made Savannah raise her hands upward and struck her with the bat in the stomach, ribs, and thigh. He then told her to turn around, and hit her three more times in the back. Savannah eventually ended up on the floor, at which point Alvarez swung the bat at her pelvic area, striking her repeatedly between the legs. While doing this he asked, "How does it feel being a [whore]?"

Once the second series of attacks were over, Alvarez told Nancy and Savannah to put the children to bed before 9:00 p.m., and departed from the residence. He fought with Nancy again after coming back home for the final time that evening, but had no further incidents with Savannah. Alvarez spent the rest of the night visiting with a neighbor named Natalie Garcia (Natalie). Savannah left the apartment the next morning and reported the abuse to the police.

Officer Jason Felgenhauer of the Bakersfield Police Department testified to his involvement in the investigation into Savannah's allegations of abuse. His testimony

confirmed that Savannah had bruises all over her body when she reported the incident, including on and around her forehead, eyes, back, and torso. Officer Felgenhaur photographed the injuries, and those images were admitted into evidence.

Officer Felgenhauer also took pictures of an aluminum bat that was found inside of Alvarez's automobile at the time of his arrest. The bat was left inside the vehicle when he was taken into custody, and the vehicle was towed away. Police later attempted to retrieve the bat from the tow yard, but the item was missing. Savannah testified that the bat depicted in Officer Felgenhauer's photographs was the same bat Alvarez had used to hit her.

By his own estimates, Alvarez made hundreds of telephone calls to friends and family from jail while he was awaiting trial. These calls were monitored and recorded, and several of the recordings were played for the jury at different stages of the proceedings. The prosecution concluded its case-in-chief by playing three audio recordings which purportedly revealed a consciousness of guilt by Alvarez, as well as a plot to suppress evidence and influence the testimony of key witnesses.

In the first recording, Alvarez tells an unidentified male, "[T]his feels like when I was in jail last time with Nancy and Nancy (unintelligible) what helped it was Nancy didn't want to testify and she didn't show up…. If we can get Savannah to do the same shit Nancy did I'm good bro. That's what I'm going to need you to do for me." Later in the conversation, Alvarez outlines his basic defense strategy:

| | |
|---|---|
| Alvarez: | "What's fucked for me is I have to prove like Nancy and Savannah fought." |
| Male: | "I know. We were just talking about that last night." |
| Alvarez: | "So I was trying to (unintelligible) like I wasn't even in the house when they were fighting[.] I came in to stop it." |
| Male: | "Yup." |

Alvarez: "Savannah is the one that had the bat. I was outside talking to Natalie. Shit[,] make sure you tell Nancy what I just said too."

Male: "Yeah."

Alvarez: "That way she can let Natalie know. It was like what ten o'clock when it happened Saturday."

Male. "Yeah."

Alvarez: "Cause the fight had just finished. This is fucked man[.] I'm fucked."

In the second recording, an unidentified female tells Alvarez, "I got all the stuff out of the van." He asks, "The bat too?" The woman replies, "Yeah…Everything."

The third recording includes a conversation between Alvarez and Nancy Alvarado. Alvarez tells Nancy to throw away "the shoe rack[,] the one that we never used." He later states that she and Natalie "are the only hope that I have…Cuz I don't think Savannah's gonna do the right thing."

Defense Case

The first defense witness was appellant's father, Guillermo Alvarez Paz. According to Mr. Paz, Alvarez came over to his house at 4:30 p.m. on July 7, 2012 to watch a UFC event. He arrived with pizza and chicken wings, and stayed until sometime after 10:00 p.m. When asked if it was possible Alvarez could have left and come back during this window of time, his father said, "I guarantee he was with me."

The second defense witness, Natalie Garcia, recalled seeing Alvarez walking towards his father's house at around 5:00 p.m. on the day in question. They had a brief conversation about Alvarez's plans to watch the UFC fight, and he continued on his way. Sometime later (she could only estimate that it was "really late" at night), Natalie went to Alvarez's apartment to see if he was home. She heard yelling from inside and walked in to find Savannah swinging a bat at Nancy and screaming, "Fuck you. You are

6.

pregnant…. If I can't have him, no one can." Both Nancy and Savannah appeared to be injured, and she noticed that Savannah's face was severely bruised and swollen.

The fighting between Nancy and Savannah continued for a few more minutes until Alvarez walked into the apartment and said, "What's going on?" His presence caused both women to calm down, and the fighting stopped. Nancy went into the bedroom, while Savannah stayed in the living room and watched a movie with Alvarez and Natalie. At some point during this sequence of events, Natalie was able to grab the bat out of Savannah's hands after she had swung at Nancy and missed. Natalie took the bat out of the apartment and locked it inside of Alvarez's van.

Alvarez testified in his own defense. He began by explaining that he had lived the lifestyle of a "player," and felt like he was emulating Hugh Hefner by cohabitating with two women who were willing to have sex with him. Savannah was not as enthusiastic about the tripartite relationship. She had always been jealous of Nancy, and would often start fights with her. The first altercation between Nancy and Savannah allegedly occurred in December 2011 after Alvarez made the mistake of buying them identical pairs of earrings for Christmas. A second fight occurred on New Year's Eve, as Savannah stated in her testimony, but Alvarez claimed the fight started because he had proposed that they all engage in a ménage-à-trois. Nancy was up for it, but Savannah did not like the idea and attacked Nancy for agreeing to participate. The women had another serious altercation on Father's Day 2012, which was also caused by Savannah's jealousy.

When questioning turned to the events of July 7, 2012, Alvarez contradicted portions of the testimony given by his father and Natalie Garcia. He claimed that he went back and forth to his father's house multiple times that afternoon, dropping off the pizza and chicken wings at approximately 4:00 p.m. and then returning around 5:00 p.m. to watch the pay-per-view event. He walked back home sometime after 10:00 p.m. and met up with Natalie outside of his apartment. As Alvarez began smoking a cigar, they both

7.

heard the sound of people arguing. Natalie ran inside the apartment to investigate. Alvarez held back for a moment to extinguish his cigar before following behind her.

When Alvarez walked into the apartment, he saw Nancy and Savannah grappling with one another. Savannah was swinging a bat with one hand and holding a knife in the other hand. Nancy had a handful of Savannah's hair and was trying to land punches with her other fist. Alvarez jumped between the women and separated them. Natalie took the bat from Savannah and then turned it over to Alvarez, who went outside and locked it inside of his van.

Alvarez admitted that he made arrangements from jail to have someone remove the aluminum bat from his impounded vehicle. He did this impulsively, out of fear, and because he believed it might somehow increase his chances of avoiding a conviction. The same was true of the metal poles from the shoe rack, even though neither he nor Natalie testified to seeing the women use those items during the fight. According to Alvarez, Nancy and Savannah had discussed their fight with him later in the evening and mentioned that the pole(s) were used before he entered the apartment. Therefore, he wanted to eliminate any evidence that might be introduced against him. Alvarez maintained that he had never harmed Savannah during their relationship, and did not cause any of the injuries she sustained on the night of July 7, 2012.

Although her name appeared on the defense witness list, Nancy Alvarado did not testify at trial.

Cross-Examination of Alvarez

On cross-examination, Alvarez said that Nancy and Savannah never talked to him about the shoe rack being used during the fight. The prosecutor reminded Alvarez that this was inconsistent with his testimony on direct examination regarding why he had asked Nancy to remove the shoe rack from his apartment. When asked which version was accurate, Alvarez said, "Can I have a minute to think?" He then claimed that Nancy

"mentioned something about the shoe rack…[but] she didn't say she hit [Savannah] with it or that Savannah hit her with it."

The prosecution played additional jailhouse recordings of Alvarez's conversations with Nancy and Natalie for impeachment purposes and to bolster its theory of witness tampering. During a recorded conversation with Natalie, Alvarez expresses his concern that Nancy "is going to try to fuck me over just like Savannah did." He tells Natalie, "Talk to her[,] try to talk some sense into her 'cause it ain't right for my kids." Later in the call he tells Natalie that he loves her, and she replies, "I love you too…I'm [going to] stand here by you the whole time."

In one of Alvarez's conversations with Nancy, he asks her about contacting her "sister," which he admitted was a code word for Savannah. Like his comments in other recordings, Alvarez states, "If she don't go to court Nancy everything will be good." Elsewhere in the conversation he accuses Nancy of not wanting to help him. She replies, "I don't want to get you in more trouble or get myself in trouble." Alvarez later says, "If I tell you to show up to my court[,] show up to my court. If I tell you to do something[,] do it. How you want me to trust you if you can't do nothing what I'm asking you?"

Further into cross-examination, Alvarez admitted to hitting Nancy in the past, being arrested for doing so, and avoiding prosecution after she chose not to testify against him. He had hoped the same thing would happen with Savannah, but did not feel his attempts to influence her involvement in the case amounted to witness tampering. Alvarez explained that in his mind, witness tampering requires an overt threat of retribution.

Alvarez attempted to contextualize some of his recorded statements by asserting that his mother had been "putting stuff in Nancy's head, like, turning her against me." The prosecution subsequently played a recorded conversation between Alvarez and his mother wherein he repeatedly accuses her of trying to persuade Nancy not to testify on his behalf. His mother denies the accusation, and insists that she merely advised Nancy

9.

to "tell the truth." The use of this recording during cross-examination is the basis for Alvarez's claims on appeal.

Rebuttal Evidence

As a rebuttal witness, the prosecution called Alison Fernandes, an ex-girlfriend of Alvarez and the mother of one of his children. Her testimony described an occasion when Alvarez had become angry and violent towards her. He threw a picture frame at her while she was nursing their child, then held a piece of glass against her throat and threatened to kill her. Alvarez admitted on cross-examination that he had slapped Alison and punched her in the face with a closed fist, but denied trying to hit her with the picture frame or threatening to kill her.

Verdict and Sentencing

Alvarez was found guilty as charged under Counts 1, 2, and 4. He was acquitted of felony assault with a deadly weapon as alleged in Count 3 (regarding the use of a pole from the shoe rack), but convicted of misdemeanor assault under section 240, a lesser included offense. The jury returned true findings on the section 12022.7 enhancement allegations for Counts 2 and 4.

Following the verdict, defense counsel filed a motion for new trial on grounds separate from those raised in this appeal. The motion was denied. Alvarez was sentenced to an indeterminate term of seven years to life in prison for the torture conviction under Count 1. Under counts 2 and 4, the trial court imposed identical sentences of nine years in prison, comprised of the upper term of four years for each conviction, plus consecutive five-year terms pursuant to section 12022.7, subdivision (e), all of which were stayed pursuant to section 654. A stayed sentence of 90 days in jail was imposed for the misdemeanor conviction under Count 3.

## DISCUSSION

**Admissibility of the Recorded Conversation Between Alvarez and His Mother**

Alvarez contends that the trial court erred by allowing the jury to hear the recorded conversation between him and his mother because (1) the evidence was not legally relevant and (2) even if it were relevant, the trial court abused its discretion by admitting the recording due to the highly prejudicial nature of his mother's comments. He further argues that the admission of this evidence violated his constitutional right to a fair trial. For the reasons that follow, we reject his claims.

<u>Background</u>

The prosecution introduced five jailhouse recordings during its cross-examination of Alvarez. This evidence was marked as People's exhibit Nos. 30, 31, 32, and 33. Exhibit No. 33 contained two separate recordings, including the conversation between Alvarez and his mother.

Following the introduction of exhibit No. 30 (a conversation with Nancy and Natalie) and before the playing of exhibit No. 31 (a conversation with Natalie), defense counsel said, "Your Honor, I am going to object as to cumulative, relevance, [and] undue consumption of time." The objection was overruled, and exhibit No. 31 was played for the jury. Afterwards, the defense renewed its prior objections to exhibit No. 31 and added an additional objection on hearsay grounds. The trial court called a 20-minute recess and held a conference with the parties regarding the renewed objection to the most recently admitted exhibit, and also the defense's challenge to the admission of additional jailhouse recordings.

During the ensuing discussion about exhibit No. 31, defense counsel referenced hearsay, speculation, relevance, and undue consumption of time, and further complained that all of the jailhouse recordings contained inadmissible propensity evidence. The trial court overruled the objections to the recordings that had already been played, then turned to the prosecution's anticipated introduction of additional conversations, i.e., exhibit

11.

No. 32 (a conversation with Nancy) and exhibit No. 33. The record indicates that defense counsel had reviewed the contents of the latter two exhibits, but the trial court had not. After expressly acknowledging these circumstances, the trial court invited defense counsel to present arguments concerning the forthcoming exhibits. Alvarez's attorney cited "the continuing objections I've made as to hearsay, speculation, [and] relevance," then discussed his belief that the recordings of Nancy's statements contained propensity evidence and were barred under the holding in *Crawford v. Washington* (2004) 541 U.S. 36. The prosecution responded that any statements by Nancy were not being offered to establish the truth of the matters asserted therein. Neither side addressed any statements made by Alvarez's mother in exhibit No. 33.

After considering further comments from both sides, the trial court rendered a tentative decision to permit the introduction of additional jailhouse recordings into evidence. The basis for its decision was articulated, in pertinent part, as follows:

"One factor that the jury can consider is whether a witness has been dissuaded or at least attempts have been made to dissuade a witness from testifying, especially when the party who is doing or attempting the dissuading knows of the ultimate result that may have on the trial itself. For reasons based on consciousness of guilt, tampering with a witness, et cetera, the Court does find that this particular information is highly probative and certainly highly relevant to determining the defendant's credibility, and the jury should be able to consider it as such….

"Under Evidence Code section 1220, certainly these are statements of a party opponent, otherwise known as admissions of a party opponent….

"Regarding the jail calls, if there's information contained within the jail calls that go[es] directly toward tampering with a witness, et cetera, and a plan to dissuade [Savannah] from testifying, that, as the Court has already deemed, is relevant to determine the defendant's credibility ostensibly because the defendant is the one making those particular statements on those recordings…."

12.

Exhibit No. 32 was played for the jury after cross-examination resumed, and a lunch recess was taken when the recording ended. The afternoon session began with questioning about the contents of exhibit No. 32. Next, the prosecution revisited Alvarez's testimony about his mother's alleged attempts to turn Nancy against him, and thereafter introduced exhibit No. 33. Before the recording was played, defense counsel said, "Your Honor, for the record, I am going to preserve the same objections and issues I have raised earlier." The trial court responded, "Those objections are overruled based on reasoning previously stated for the record."

The relevant conversation in exhibit No. 33 centers around Alvarez's belief that his mother instructed Nancy not to testify on his behalf. Alvarez repeats the accusation multiple times, and his mother continually asserts that she told Nancy to tell the truth. Their colloquies reasonably support the inference that Alvarez's mother believed her son was trying to get Nancy to perjure herself, and, by further implication, that she believed he was guilty of harming Savannah. An example of this can be found in the following excerpt:

| | |
|---|---|
| Mother: | "Why is it her word against the other girl?" |
| Alvarez: | "It's three against one." |
| Mother: | "And they're going to measure everything son. So if they find out she lied, she will be in it too." |
| Alvarez: | It's three against one. |
| Mother: | "Yeah, oh, well, I don't know…. I don't know if she's going to do it or not." |
| Alvarez: | "What are you telling her mom?" |
| Mother: | "I told her to be brave." |
| Alvarez: | "She's telling me you told her not to." |
| Mother: | "I told her to be brave. Okay? If both of you get locked up, what will happen to your kids?" |

13.

Alvarez:   "She's not."

Alvarez's mother also alludes to a prior incident in her own life, presumably one involving criminal charges ("I was looking [at] three years").  She tells her son: "I've been on the other side and I man'd up to what I did.  I man'd up." (Sic.)  Alvarez replies, "Yeah, but you weren't a parent at the time."  His response is ambiguous, but later in the recording he states, "I already told you mom.  There's nothing out there worth losing my babies."

Alvarez's arguments on appeal focus on the above excerpts, as well as the following exchange:

Alvarez:   "I don't want to be in here for the rest of my life."

Mother:   "You're not going to be there the rest of your life.  What you confess is what you're gonna receive.  If you confess you will receive.  Okay?"

Alvarez:   "I have faith that I'm getting out."

Analysis

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion.  (*People v. McKinnon* (2011) 52 Cal.4th 610, 658.)  A ruling based on a demonstrable error of law is an abuse of discretion in and of itself.  (*People v. Cooper* (2007) 148 Cal.App.4th 731, 742.)  Thus, for example, a trial court has no discretion to admit irrelevant evidence.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.)  Our threshold inquiry is whether the challenged evidence was legally relevant.  If the answer is yes, we must determine whether the trial court was obligated to exclude the evidence despite its relevance.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)  Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  Evidence tending to show a consciousness of guilt is

14.

relevant and admissible for that purpose. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1162; *People v. Farnam* (2002) 28 Cal.4th 107, 153-154 (*Farnam*).) Evidence of a defendant's attempt to influence a witness's testimony or to fabricate an alibi may be used to establish consciousness of guilt, and is therefore relevant and admissible. (*People v. Nelson* (2011) 51 Cal.4th 198, 214 and fn. 9; *People v. Hannon* (1977) 19 Cal.3d 588, 599; *People v. Blau* (1956) 140 Cal.App.2d 193, 213-214; CALCRIM No. 371.)

Alvarez attempted to explain and mitigate the impact of his statements in earlier recordings by asserting that his mother had been "putting stuff in Nancy's head" and "turning her against me." The recorded conversation in exhibit No. 33 had a tendency to prove or disprove this assertion, and was admissible for that purpose. Furthermore, several aspects of the conversation, while open to interpretation, were probative of the witness tampering issue and the defendant's alleged consciousness of guilt. In addition to the excerpts reproduced above, there are parts of the conversation where Alvarez gets agitated at his mother for communicating with Nancy and also tells her, "Just mind your business. I know what I'm doing." Even if some of his mother's statements conveyed her doubts about his innocence, Alvarez's equivocal responses could fairly be interpreted as revealing a consciousness of guilt. (*People v. Tolbert* (1969) 70 Cal.2d 790, 805 ["Accusatory statements and the defendant's responses thereto may be received where, under circumstances calling for a denial, there were equivocal or evasive answers indicating a consciousness of guilt or acquiescence in the truth of the statements."].) The legal relevance of the conversation is beyond dispute.

As Alvarez concedes in his reply, his trial attorney's vague reference to objections asserted in an earlier part of the proceedings was at best sufficient to preserve challenges on grounds of relevance, "speculation," and the hearsay rule. The trial court was within its discretion to overrule these objections because none of them compelled the exclusion of the evidence. Relevance and speculation comprise a single objection, i.e., evidence is irrelevant when it leads only to speculative inferences. (*People v. Morrison* (2004)

15.

34 Cal.4th 698, 711.) Alvarez's conversation with his mother logically and reasonably supported inferences of his involvement in a witness tampering plot, and an overall consciousness of guilt. Such conclusions go beyond mere speculation. (See *People v. Massie* (2006) 142 Cal.App.4th 365, 373-374 [explaining the difference between inference and speculation].) The cases cited by appellant concerning opinion testimony by police officers and expert witnesses on the issue of a defendant's guilt are inapposite. (E.g., *People v. Killebrew* (2002) 103 Cal.App.4th 644, 651; *People v. Torres* (1995) 33 Cal.App.4th 37, 46-47.)

Regarding the hearsay objection, Alvarez's own words were admissible as statements by a party to the case. (Evid. Code, § 1220; *People v. Horning* (2004) 34 Cal.4th 871, 898 ["The hearsay rule does not bar statements when offered against the declarant in an action in which the declarant is a party."].) The statements made by his mother were admissible for the non-hearsay purpose of giving context to Alvarez's side of the conversation, among other potential hearsay exceptions. (*People v. Davis* (2005) 36 Cal.4th 510, 534-536.) The record does not suggest that the parts of the conversation which Alvarez finds objectionable were offered for the truth of the matters asserted (e.g., that Alvarez actually needed to "man up" or "What you confess is what you're gonna receive").

Alvarez complains that the trial court should have at least given the jury a limiting instruction to safeguard against any misuse of his mother's statements, but acknowledges he made no such request at trial. This precludes a finding of error on those grounds. (See Evid. Code, § 355 [trial court must restrict evidence to its proper scope and so instruct the jury if a party requests a limiting instruction].) "Although the court apparently offered to instruct the jury on the purpose for which it could consider this evidence, it never did. Defendant did not, however, request such an instruction, which waives the issue. The court has no sua sponte duty to so instruct. (*People v. Freeman* (1994) 8 Cal.4th 450, 495.)

16.

Turning to Alvarez's argument about the prejudicial nature of the recording, we note the trial court was never asked to weigh the probative value of exhibit No. 33 against the potentially unfair impact of his mother's statements therein. Likewise, no objection was made pursuant to the balancing provision of Evidence Code section 352. In the absence of such an objection or request, trial courts are not required to weigh the probative value of relevant evidence against the potentially prejudicial effect it may have on the jury. (*Farnam*, *supra*, 28 Cal.4th at p. 154; *People v. Zapien* (1993) 4 Cal.4th 929, 958; *People v. Anderson* (1990) 52 Cal.3d 453, 477.)

In sum, the recorded conversation between Alvarez and his mother was relevant and admissible. Appellant has not shown error in the trial court's decision to admit the evidence over defense counsel's vague and generalized objections, as none of those objections compelled the exclusion of the evidence. To the extent that his federal constitutional claims may have been preserved for appeal (the arguments were not raised below), those claims fail in light of the absence of any error under state law. (*People v. Linton* (2013) 56 Cal.4th 1146, 1202; *People v. Jones* (2013) 57 Cal.4th 899, 957 ["[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights."].) In any event, the admission of relevant evidence does not violate the right to due process unless the evidence is so prejudicial that it renders the defendant's trial fundamentally unfair (*People v. Partida* (2005) 37 Cal.4th 428, 439) – a rare occurrence that is not reflected in the record before us.

**Ineffective Assistance of Counsel**

Alvarez claims he received constitutionally deficient representation as a result of his trial attorney's failure to (1) insist that the trial court review the contents of exhibit No. 33 before allowing it to be played for the jury, (2) assert adequate objections regarding the admissibility of the recording, i.e., to challenge the evidence pursuant to Evidence Code section 352, and (3) request a limiting instruction as to the permissible

17.

scope and use of the recording. He further contends that his counsel's allegedly deficient performance in these areas requires reversal of his convictions. We disagree.

"'A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.""" (*People v. Lucas* (1995) 12 Cal.4th 415, 436, original italics.) To prevail on an ineffective assistance of counsel claim, one must first establish that the performance of his or her attorney fell below an objective standard of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).) "Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, ""'but for counsel's unprofessional errors, the result of the proceeding would have been different.'""" (*Anderson*, *supra*, 25 Cal.4th at p. 569.) A reasonable probability of prejudice must be shown, meaning a probability sufficient to undermine confidence in the outcome. (*Ibid*.)

The failure to object to evidence is rarely sufficient to establish incompetence or constitutionally deficient performance by trial counsel. (*People v. Frierson* (1991) 53 Cal.3d 730, 747.) It is unnecessary for us to evaluate the performance of the trial attorney in this case, however, because appellant's arguments regarding prejudice are untenable. We thus proceed directly to the second prong of the *Strickland* analysis. (*Strickland*, *supra*, 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."]; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 430-431.)

The thrust of Alvarez's argument is that exhibit No. 33 revealed his mother's belief that he was guilty of committing some type of crime against Savannah. He submits that "[t]his condemnation of appellant by his own mother was highly prejudicial and served to devastate appellant's credibility before the jury…." Although his mother never

expressly stated her doubts about his innocence, Alvarez believes her words had the effect of "wafting innuendo into the jury box."

Alvarez overlooks the fact that he actually testified to his own belief that his mother doubted his innocence. This revelation came in the midst of questioning about why he arranged for his associates to eliminate evidence:

Counsel:     "Did you hide the bat or the shoe rack because you actually used that?"

Alvarez:     "No."

Counsel:     "When you threw away the bat and the shoe rack, did you tell your defense investigator and your defense team about it?"

Alvarez:     "No."

Counsel:     "Why didn't you tell your own attorney about it?"

Alvarez:     "**I had my mom turn her back on me thinking I actually did something I didn't do**. Just everybody closed me out. Like, I felt alone. If I tell the attorney that, like, oh, yeah, I did this because I was scared, look at me, and try to railroad me, I want somebody who is going to fight for me, who is not just going to let me sit in here and do time just to say they tried the case." (Emphasis added.)

It makes little sense for Alvarez to argue his credibility was unfairly impugned by inferences the jury might have drawn from exhibit No. 33 regarding his mother's opinion about his guilt or innocence when he volunteered the same information in more explicit terms. The argument also ignores the myriad ways in which Alvarez's credibility was tarnished through other testimony he gave on the witness stand. The recorded conversation with his mother was a small component of the prosecution's case, and relatively insignificant in comparison to the strength of its additional evidence in support of his guilt. Given these facts and circumstances, we find no basis upon which to

conclude that the outcome of the case would have been different if exhibit No. 33 had been excluded or if the jury had been given a limiting instruction.

**Sentencing Under Count 1**

Alvarez claims that the trial court imposed an unauthorized sentence by ordering him to serve a term of seven years to life in prison for the crime of torture. He does not dispute that an indeterminate life sentence is mandated by statute, but argues the trial court exceeded its authority by specifying that his sentence is subject to a minimum confinement period of seven years. He therefore asks that we modify the judgment to reflect a sentence under Count 1 of "life with the possibility of parole." Respondent concedes the issue, but offers no analysis for her position beyond noting that under section 206.1, "Torture is punishable by imprisonment in the state prison for a term of life." We decline to accept the concession because we do not believe appellant has established error.

Section 3046 provides, in pertinent part: "No prisoner imprisoned under a life sentence may be paroled until he or she has served . . . [a] term of at least seven calendar years…." (§ 3046, subd. (a)(1).) Therefore, as he recognizes in his briefing, Alvarez is statutorily ineligible for parole for a minimum period of seven years notwithstanding the indeterminate nature of his sentence. We find support for the trial court's express recognition of this parole ineligibility period in *People v. Jefferson* (1999) 21 Cal.4th 86 (*Jefferson*), where the California Supreme Court was asked to decide the proper pronouncement of sentence for defendants who were convicted of attempted deliberate and premeditated murder in a gang-related incident.

The *Jefferson* opinion notes that the term of imprisonment for premeditated attempted murder is an indeterminate sentence of life with the possibility of parole (§§ 664, 187, 189). (*Jefferson*, *supra*, 21 Cal.4th at p. 93.) The court further observed that under normal circumstances the minimum period of confinement for that crime would be seven years, as provided in section 3046, subdivision (a)(1), but that section

186.22, subdivision (b)(4) provides for a mandatory minimum term of 15 years for a gang-related attempted murder. (*Id.* at pp. 96, 100.) It was held that the trial court did not err by imposing a sentence of 15 years to life, which expressly incorporated the minimum term established by sections 186.22 and 3046, subdivision (a)(2). (*Id.* at pp. 99-102.)

In a footnote to the opinion, the high court expressed its view that, "By including the minimum term of imprisonment in its sentence, a trial court gives guidance to the Board of Prison Terms regarding the appropriate minimum term to apply, and it informs victims attending the sentencing hearing of the minimum period the defendant will have to serve before becoming eligible for parole. Thus, when the trial court here pronounced defendants' sentences, it properly included their minimum terms." (*Jefferson*, *supra*, 21 Cal.4th at p. 101, fn. 3.) The same reasoning can be applied here given that the indeterminate life sentence mandated by section 206.1 is subject to a minimum confinement period of seven years pursuant to section 3046, subdivision (a)(1). Since no error has been shown in relation to the sentence imposed by the trial court, we have no reason to alter the judgment.

## DISPOSITION

The judgment is affirmed.


_____
Gomes, J.

WE CONCUR:


_____
Hill, P.J.


_____
Cornell, J.

21.