Filed 10/25/23  P. v. Snead CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080304 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE401343) |
| ROBERT JOSEPH SNEAD III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge.  Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Robert A. Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steven T. Oetting and Kristen A. Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant Robert Joseph Snead III (appellant) of simple assault (Pen. Code, § 240, the lesser included offense of Pen. Code, § 245, subd. (a)(4), assault by means likely to produce great bodily injury [count 1]); false imprisonment by violence, menace, fraud, or deceit (Pen. Code, §§ 236, 237, subd. (a) [count 2]); vandalism over $400 (Pen. Code, § 594, subds. (a), (b)(1) [count 3]); battery (Pen. Code, § 242 [count 4]); and damage to a wireless communication device to prevent assistance (Pen. Code, § 591.5 [count 5]). Appellant is not contesting his vandalism conviction.

The charges arose from a domestic violence incident in which appellant prevented his then girlfriend, L.M., from leaving the apartment they shared. During the event, appellant strangled L.M. twice. He also hit J.R., L.M.'s friend who was also present, in the face. Appellant then took J.R.'s cellular phone from her hand during a 911 call, smashing the phone by throwing it onto the ground from the second-floor outdoor walkway. Later, appellant would throw the phone onto the apartment building's roof. At trial, appellant admitted to taking and throwing the phone.

As to counts one, two and four, appellant contends the trial judge abused his discretion, violating appellant's due process rights by admitting into evidence a recent, uncharged domestic violence incident in which appellant allegedly strangled L.M. Appellant further claims that the trial court erred by instructing the jury as to adoptive admissions based on a text message exchange with J.R. discussing a second uncharged domestic violence incident.

We conclude the trial court acted within its discretion by admitting evidence of appellant's prior domestic violence act. We also conclude that the trial court did not err in instructing the jury about adoptive admissions.

2

Because we find no error in the trial court's rulings, we do not consider cumulative error claims. We affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Current Case.*

Appellant dated L.M. for over two years. At the relevant time, appellant and L.M. lived together in an apartment L.M. leased. On June 13, 2020, L.M. came to believe that appellant was cheating on her after hearing suspicious background noises during a phone conversation. L.M. informed appellant their relationship was over, and he needed to move out.

On June 14, 2020, L.M. and J.R. packed appellant's belongings, putting them outside in front of the apartment. L.M. sent messages to appellant that he should pick up his effects.

Appellant arrived at the apartment, entering through a window by breaking off its screen. L.M. and J.R. sat on couches in the living room, while J.R. spoke on her cellphone to a friend. Appellant entered the living room appearing enraged. Throughout the ensuing encounter, appellant continued to look angry, yelling repeatedly that he would not leave, and the relationship was not over. Appellant also threw items in the apartment, breaking a shoe rack and scattering its contents on the floor. Fearing appellant would become violent, J.R. asked the friend with whom she was on the phone to call 911.

Appellant repeatedly told J.R. to leave. L.M. stated that she wanted J.R. to stay; L.M. did not feel safe alone with appellant. At first, J.R. remained, but then left out of fear for her security. J.R. exited to the second-story walkway outside L.M.'s apartment.

3

As J.R. left, L.M. attempted to go with her. However, appellant slammed the front door closed, pinning L.M. against the wall next to it, which prevented her exit. Appellant choked L.M. by squeezing one hand around her throat for at least one minute. While he strangled her, appellant said L.M. was crazy, he was not cheating, their relationship was not over, and he would not leave. L.M. struggled to breathe and speak, her vision blurred, and she saw "stars." L.M. also felt weak, dizzy, and lightheaded, as though she might faint or fall. L.M. begged appellant to stop strangling her because she could not breathe. L.M. also told appellant he was hurting her. At some point, appellant stopped strangling L.M.

Almost immediately L.M. attempted to leave the apartment, but appellant stopped her by again strangling her and forcefully holding her neck against the wall to prevent her from going. This second strangling episode was less forceful and shorter than the first but made it difficult for L.M. to breathe; L.M. felt faint. At some point, appellant released L.M., and she escaped the apartment.

Remaining outside during the incident, J.R. could hear L.M. screaming and things breaking. J.R. called 911, reporting that appellant was hurting L.M. by hitting her and choking her, that he would not let J.R. in or L.M. out, and that he was breaking items in the apartment. Just then, L.M. came outside, running from appellant.

Appellant followed L.M. out of the apartment. He saw J.R. on the phone,[1] argued with her, hit her in the chin, grabbed her phone, and threw it from the second-floor walkway to the driveway below. When he hit J.R.'s chin, appellant scratched J.R., causing her to scream. The 911 operator

---

[1] At trial appellant denied knowing J.R. was speaking to a 911 dispatcher.

4

would later report to the fire department hearing a scuffle and then losing contact with J.R.

Appellant saw where the phone landed in the parking lot below. He went and retrieved the phone, slammed it back down on the pavement, picked it up again, and threw it onto the apartment building's roof. Appellant then left and drove to Orange County. His sister later arrived at the scene and retrieved the cellphone from the apartment building roof; the phone was shattered and did not work.

While appellant's attention remained focused on smashing J.R.'s phone, L.M. and J.R. ran into a neighbor's apartment. The neighbor had already called 911 by the time they entered. The 911 dispatcher relayed questions to L.M. through the neighbor, including whether anyone needed medical attention. L.M. replied, "I don't know he just kind of choked me." When asked if she lost consciousness, L.M. stated that she "blacked out a little bit." J.R. stated, "he hurt me" and "[h]e hit me in the jaw when he was grabbing my phone, he threw my phone uh on the ground and over the roof and he uh hurt my – hit me in the chin."

Although L.M. declined medical attention after the incident, L.M.'s throat was very sore, including when she ate and drank, and she had visible red marks on her neck. Her neck pain continued for two to four days.

### B. The Prior Strangling Incident.

At trial, the People moved the court to admit into evidence a prior uncharged strangling incident, pursuant to Evidence Code[2] section 1109, subdivision (a). The Defense argued that allowing a jury to hear about the

---

2    All further statutory references are to the Evidence Code unless otherwise stated.

prior event violated section 352 because the "evidence would be more prejudicial than probative." The court inquired of the People about an undue consumption of time. The People replied that they intended to question L.M. only about a January / February 2020 incident. The trial court granted the motion, limiting to 20 minutes the People's direct examination of L.M. about the incident. The court did not impose on appellant any time constraint for L.M.'s cross-examination.

At trial, L.M. testified that five or six months prior to the June 14, 2020, events appellant attempted to take her car. When she told him he could not and tried to take the keys out of the ignition, appellant pinned L.M. down on the seat with his body on top of her and strangled her by putting his hand forcefully around her neck for approximately one to two minutes. She had difficulty breathing and felt faint during and after the strangling. After appellant stopped strangling L.M., he drove away with her in the passenger seat. He then pulled over, parking the car up against a fence so L.M. could not open the door. Appellant yelled at L.M. She tried to climb over the back seat; he laughed and grabbed her. Appellant started driving again, and L.M. jumped out of the car while it was moving. Although she scraped her knee exiting the car, she walked back to her apartment. After the incident, L.M.'s throat was sore, and her neck was red.

L.M. did not report this incident to police because L.M. loved appellant, he apologized, and she felt trapped because they lived together. L.M. testified at trial that the June 14, 2020, incident was more severe, traumatic, and violent than the prior strangling incident.

6

*C. The Text Message Exchange.*

During appellant's cross-examination of J.R., defense counsel asked why J.R. asked her friend to call 911 after appellant entered the apartment. The question led to this exchange:

> [J.R.]: Because we -- because we were scared and we knew he gets violent.
> [Defense Counsel]: Okay. What do you mean, "we knew he gets violent"?
> The Court: Counsel, you can ask that question. Do you want to ask that question?
> [Defense Counsel]: I do.
> The Court: Go ahead.
> [Defense Counsel]: I think it needs to be addressed.
> [J.R.]: He has hit her many times before.
> [Defense Counsel]: Okay. Were you present during these times?
> [J.R.]: No. But I have witnessed the bruising and the swelling of her face.

Defense Counsel proceeded to question J.R. about a text message exchange between J.R. and appellant following an incident different from the event the court ruled admissible and already described by L.M. to the jury. From this separate domestic violence event, appellant's trial attorney read text messages into the record, confirming the content of the messages with J.R.:

> [Appellant]: Check on L.M., please[.]
> [¶] . . . [¶]
> [J.R.]: Hi, I've been talking to her all morning. She's coming over for dinner[.]
> [¶] . . . [¶]
> [Appellant]: Okay[.]
> [¶] . . . [¶]
> [J.R.]: Are you okay[?]
> [¶] . . . [¶]
> [Appellant]: I'm fine[.]

7

> [¶] . . . [¶]
> [J.R.]: I'm mad at you[.]
> [¶] . . . [¶]
> [Appellant]: I'm sure[.]

Appellant then described at length a scenario that implied L.M. was hitting him while he was driving. The conversation continued:

> [Appellant]: What exactly are you upset with me for[?]
> [¶] . . . [¶]
> [J.R.]: Hitting her[.]
> [¶] . . . [¶]
> [Appellant]: I hit her[?] Or did I stop her from killing us on the highway[?]
> [¶] . . . [¶]
> [J.R.]: She said you hit her after you pulled over and at home[.]
> [¶] . . . [¶]
> [Appellant]: Did she now[?]
> [¶] . . . [¶]
> [J.R.]: So when did you hit her[?]
> [¶] . . . [¶]
> [Appellant]: You know what the kicker is? We were at the house, and she would hit me and yell, oh, my god, he's hitting me and say, "You're going to jail, [expletives omitted]!" Crazy.
> [¶] . . . [¶]
> [J.R.]: So you didn't hit her at the house, only in the car?
> [¶] . . . [¶]
> [Appellant]: All it takes is for her to say anything[.]
> [¶] . . . [¶]
> [J.R.]: I believe you. I know how she gets. She is going to quit drinking.

At trial J.R. explained that when she said she believed appellant, "[t]hat comment is talking about how she gets when she's drunk, not that he didn't hit her." She continued, "It wasn't that I didn't believe that he did not hit her. He did hit her. Her whole face was swollen this big and black and

8

blue. She had to call out of work and miss work for a couple weeks because of her face."

Because of this text message exchange, the trial court, over appellant's objection, gave the jury an adoptive admissions instruction, CALCRIM No. 357.[3]

### D. Appellant's Testimony.

At trial, appellant denied hitting L.M. on any occasion. But he admitted to taking J.R.'s phone and throwing it. He explained the reason as, "Just I am leaving. I'm no longer a threat. I'm getting out of the situation. There's no need to escalate this any further. If the police are called, I'm -- like I said, the climate at the time, I just didn't want to be involved with any kind of police activity." He denied knowing that J.R. was on the phone with 911.

In an interview with a Sheriff's Deputy the day after the incident, however, appellant said J.R. told him that she was going to call the police. He also denied doing anything with J.R.'s phone.

---

[3] "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tends to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true. [¶] One, the statement was made to the defendant or made in [his] presence; two, the defendant heard and understood the statement; three, defendant would under all circumstances naturally have denied the statement if [he] thought it was true; and, four, the defendant could have denied it but did not." (CALCRIM No. 357)

## III. DISCUSSION

*A. Admission of Prior Domestic Violence.*

Appellant offers several reasons why the trial court abused its discretion in admitting evidence of the prior strangling under section 1109, subdivision (a)(1). First, he contends the evidence was unduly prejudicial because the prior strangling incident was never charged and, therefore, was more inflammatory than the charged event. Second, appellant maintains that introducing in evidence the prior domestic violence event was likely to, and did, consume unjustifiable trial time. Finally, appellant contends the incident had little probative value because the testimony describing it lacked specific details or corroborating evidence and because the uncharged and charged events lacked sufficient similarity. We disagree with appellant and conclude that the trial court did not abuse its discretion in admitting prior strangulation evidence.

We review the trial court's admission of evidence under section 1109, subdivision (a)(1) for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.) "A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

Section 1109, subdivision (a)(1) makes "evidence of the defendant's commission of other domestic violence" admissible to establish the defendant's propensity to commit such acts "in a criminal action in which the defendant is accused of an offense involving domestic violence." (§ 1109, subd. (a)(1); *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143.) The court can allow propensity evidence if it "is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).)

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Undue prejudice as meant here " ' "applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

When examining admissibility under section 352, "trial judges must consider such factors as [the prior act's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) The Supreme Court has explained, "the probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense," and "the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term . . . ." (*Ibid.*)

Here, the trial court properly weighed the propensity evidence's probative value, potential for undue prejudice, and time consumption. The

11

trial court limited the prior strangulation incident to one witness and a specified, short period for direct examination. The prior strangling was highly probative of the charged offenses because both domestic violence acts involved the same victim, L.M., and the same method of assault: confining the victim and strangling her. Further, the acts were close in time, occurring only five or six months apart. The highly similar nature and proximity of the acts creates a high probative value despite the lack of independent evidence and details regarding the prior incident.

Appellant argues that permitting evidence of the prior strangulation was reasonably likely to consume unwarranted and substantial amounts of trial time, despite the 20-minute limit on direct examination of L.M. He supports his claim by providing a breakdown of testimony regarding prior incidents by percentage of time consumed for each witness. Even assuming the accuracy of these percentages, we disagree that 25 percent of L.M.'s direct examination or 36 percent of her cross examination represented an "undue consumption of time" on a highly probative incident.

As to J.R.'s testimony, appellant himself introduced a prior domestic violence incident different from the strangling event the court admitted. Any time for that examination is appellant's responsibility. Appellant cannot now complain about trial time devoted to an event he brought to the jury. This does not support finding the court abused its discretion.

Likewise, we are unpersuaded that the prior incident "misled" the jury to convict appellant of the charges. The nature of the prior act testimony was not inflammatory. Further, using CALCRIM No. 852A the court properly instructed the jury regarding how to evaluate section 1109 evidence. The trial judge explained to jurors that even if the prosecution proved the prior act occurred, they "may, *but are not required* to, conclude…defendant was

12

disposed or inclined to commit domestic violence," and "that conclusion is *only one* factor to consider along with all the other evidence." (CALCRIM No. 852A, italics added.) We presume the jury followed the trial court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Having concluded that the trial court did not abuse its discretion in admitting evidence of the prior strangulation based on section 352, we conclude admission of the prior domestic violence matter did not violate appellant's due process rights. (*People v. Mani* (2022) 74 Cal.App.5th 343, 374–376 ["Where, as here, the trial court does a proper section 352 analysis, there is no due process violation."]; accord *Falsetta*, *supra*, 21 Cal.4th at pp. 912–915.)

### B. *Adoptive Admission Instruction.*

Appellant next argues that substantial evidence did not support the trial court's adoptive admission instruction because appellant denied the accusations in the text message exchange with J.R. We disagree, concluding that the admitted evidence was sufficient to place before a jury whether appellant's replies were evasive or equivocal.

" ' "[A] typical example of an adoptive admission is the accusatory statement to a criminal defendant made by a person *other* than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true." [Citation.]' [Citation.]. 'For the adoptive admission exception to apply, however, a direct accusation in so many words is not essential.' [Citation.] ' "When a person makes a statement in the

13

presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence." [Citation.]' [Citation]." (*People v. Jennings* (2010) 50 Cal.4th 616, 661.)

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) Conversely, a trial court commits error by instructing the jury on adoptive admissions when there is insufficient evidence of any element of an adoptive admission. (*People v. Chism* (2014) 58 Cal.4th 1266, 1297–1298.) We review de novo whether a jury instruction was supported by substantial evidence. (*People v. Parker* (2022) 13 Cal.5th 1, 68.) "We 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550.)

It is undisputed that in a text message exchange between appellant and J.R., she accused him of hitting L.M. Appellant contends that he denied these domestic violence accusations. We conclude that substantial evidence existed for a reasonable jury to determine that appellant did not deny hitting L.M. A jury could decide appellant responded evasively or equivocally in the text message conversation with J.R. by answering her accusations with questions ("I hit her?"; "Did she [L.M.] now [tell J.R. that appellant hit L.M.

14

in the car and at home]?"; "You know what the kicker is?"). And when J.R. asked appellant for the last time if he hit L.M. in the house, in addition to striking her in the car, he responded with the vague statement: "All it takes is for her to say anything."

Based on this evidence, the trial court properly left to the jury whether appellant's responses constituted adoptive admissions. (*People v. Charles* (2015) 61 Cal.4th 308, 324 ["[D]efendant argues the letter did not constitute an adoptive admission because he did not admit he committed the crimes, but blamed them on a nameless third party. . . . His argument is meritless because it goes not to its admissibility, but to the evidentiary weight of the letter, a matter for the jury."]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1011 ["To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide."].)

To advance his argument that his responses did not constitute adoptive admissions, appellant contrasts his text messages to three cases in which courts held a defendant's responses to be evasive or equivocal. (*People v. Armstrong* (2019) 6 Cal.5th 735, 789–790 [When a witness stated that a codefendant committed a murder, Armstrong said to the codefendant, "How did he know?"; when the codefendant described Armstrong's participation in the crime, Armstrong did not refute the accusations.]; *People v. Preston* (1973) 9 Cal.3d 308, 313–314 [A witness testified that one murder codefendant said, "[W]e went down to your mother's trailer house, and we broke in, and as we were leaving, we had everything ready to go out, and they came in, and there was an accident and . . . but they won't talk"; another

codefendant then stated, "There wasn't much money."]; *People v. Tolbert* (1969) 70 Cal.2d 790, 805–806 [After officers found a gun in the witness's home, she asked the murder defendant if the gun was his and if he put it there, and he replied, "Forget about it."].) Appellant argues that because the defendants in those cases either refused to discuss the matter or implied the truth of the accusation in the response, and his responses do neither, his text statements cannot be evasive or equivocal. Nothing in those cases so limit the bounds of an adoptive admission. Simply because appellant's responses differed from those in the cited cases does not prevent a reasonable trier of fact from finding appellant's statements evasive or equivocal.

We conclude that the trial court properly instructed the jury on adoptive admissions.

### C. Cumulative Error.

We have concluded that regarding the issues appellant raised there was no error. "[I]n the absence of error, there is nothing to cumulate." (*People v. Duff* (2014) 58 Cal.4th 527, 562.) The trial court properly indulged its discretion in this case.

## IV.  DISPOSITION

We affirm the judgment.

RUBIN, J.

WE CONCUR:


HUFFMAN, Acting P. J.


CASTILLO, J.